CHICAGO MESSENGER SERVICE, Plaintiff-Appellant, v. GERTRUDE W. JORDAN, Director of Employment Security, *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—03—1391

Opinion filed February 18, 2005.—Rehearing denied March 14, 2005.

Timothy F. Haley and Alison B. Willard, both of Seyfarth Shaw, L.L.P., of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Gary Feinerman, Solicitor General, and Paul Racette, Assistant Attorney General, of counsel), for appellees.

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Plaintiff Chicago Messenger Service (CMS) sought administrative review in the circuit court of Cook County of a supplemental decision by the defendant Director of Employment Security Gertrude Jordan (the Director), which adopted the report of a representative of the defendant Department of Employment Security (the Department), before whom a hearing had been held. Pursuant to an audit, the Director determined that certain couriers who worked for CMS were employees rather than independent contractors, and thus, they were not exempt under section 212 of the Unemployment Insurance Act (the Act) (820 ILCS 405/212 (West 2002)). The Director found that CMS owed more than $125,000 plus interest for unpaid unemployment insurance contributions for 1989 and 1990. The circuit court upheld the Director's supplemental decision.

The main issue raised on appeal by CMS is the applicability of *United Delivery Service, Ltd. v. Didrickson*, 276 Ill. App. 3d 584, 659 N.E.2d 82 (1995), in which delivery service drivers were determined to be independent contractors. Specifically, CMS contends that *United Delivery Service* controls the result under section 212(B) of the Act and, thus, renders the Director's decision clearly erroneous. CMS also contends that the manner in which the audit was conducted warrants reversal and that the Department was estopped from holding it liable for back contributions and interest. We disagree with CMS' contentions, and for the reasons that follow, we affirm the circuit court's judgment upholding the Director's supplemental decision.

## BACKGROUND

CMS is engaged in the messenger delivery service business in the Chicago metropolitan area. It utilizes couriers to pick up, transport and deliver packages.

In 1992, following its audit of CMS for the years 1989 and 1990, the Department determined the employment relationship of CMS and certain couriers to be that of employer and employee. As a result of its determination, the Department issued an assessment against CMS for unpaid unemployment insurance contributions plus interest for the two years in question. CMS filed a protest of the determination and requested a hearing, which was held in August 1993 before the Director's representative (the representative), defendant Ronald Rodgers. Among others, CMS president William Factor and one courier testified at the hearing.

The hearing testimony revealed the following pertinent facts about CMS' business. CMS' customers place orders for package deliveries by telephoning CMS. Once the orders are taken in the CMS office, they are ultimately dispatched to the couriers, who make the pickups and deliveries. The couriers are not required to accept any particular assignments for deliveries, nor are they required to work certain hours or fulfill a certain quota of deliveries. Neither are they required to attend any meetings or report to the CMS office. The couriers are paid after they provide CMS with a weekly invoice of their deliveries. Some couriers deliver their invoices to the CMS office in person, but others send them in.

Most of the couriers perform their services by car, although about 10% to 15% of them make their deliveries by bicycle. The couriers who use a car are required to enter into a lease agreement with CMS under regulatory requirements. In addition to the equipment lease, the couriers, including those who perform their services by bicycle, enter into a written agreement with CMS. Although the couriers are not required

to wear a full uniform, under the terms of their agreement, they must "wear appropriate identifying colors and patches and shall display such I.D. badges" that certain property owners might require as a condition for access. The couriers who make their deliveries by car are required to display a placard identifying CMS in the vehicle.

In 1994, the representative issued a report finding that the individuals included in the audit were employees of CMS. CMS filed objections to the report, which the Director upheld in July 1994. In rendering her decision, the Director found that the matter was controlled by a relatively early supreme court case, *Rozran v. Durkin*, 381 Ill. 97, 45 N.E.2d 180 (1942), which applies section 212 of the Act to messenger delivery firms. The Director found the CMS facts to be substantially similar to those presented in *Rozran*, which she specifically found was still viable and supported by subsequent court decisions. The Director adopted the representative's report in whole, finding that the evidence supported his conclusion that CMS failed to satisfy any of the three conditions for exclusion from employment set forth in section 212 of the Act.

CMS first sought administrative review of the Director's decision in August 1994. The circuit court ultimately remanded the matter to the Director for reconsideration in light of *United Delivery Service*.

In August 1999, the Director issued a supplemental decision, finding that CMS did not satisfy two of the three requirements of section 212 to designate the couriers as independent contractors. Contrary to the representative's conclusion, the Director found that the couriers were free from direction or control, and thus, CMS met the conditions under section 212(A) of the Act. The Director concluded, however, that CMS had not satisfied the requirements under either section 212(B) or (C). Except for the reasoning concerning section 212(A), the Director explicitly adopted the representative's report and incorporated it as part of the supplemental decision.

CMS sought judicial review of the supplemental decision. In April 2003, the circuit court issued a memorandum decision and judgment, upholding the Director's supplemental decision. Plaintiff then filed this appeal.

## DISCUSSION

The Act (820 ILCS 405/100 *et seq.* (West 2002)) provides economic relief to the involuntarily unemployed through the collection of compulsory contributions from employers and the payment of benefits to eligible unemployed persons (820 ILCS 405/100 (West 2002)). See *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 396, 763 N.E.2d 272 (2001). Liability for contributions

and eligibility for benefits depend in part on the existence of an employment relationship, the determination of which is controlled by the more inclusive statutory definitions rather than the common law. *AFM Messenger Service, Inc.*, 198 Ill. 2d at 396. "Employment" is given an expansive definition under the Act to include "any service *** performed by an individual for an employing unit." 820 ILCS 405/206 (West 2002); *AFM Messenger Service, Inc.*, 198 Ill. 2d at 397.

Section 212 of the Act provides an exemption from employment for services performed by independent contractors where the following three conditions are proven. 820 ILCS 405/212 (West 2002); *AFM Messenger Service, Inc.*, 198 Ill. 2d at 397. First, the individual performing services must "ha[ve] been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact." 820 ILCS 405/212(A) (West 2002). Next, it must be proven that "[s]uch service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed." 820 ILCS 405/212(B) (West 2002). Finally, the individual must be "engaged in an independently established trade, occupation, profession, or business." 820 ILCS 405/212(C) (West 2002).

Because the Act sets forth the three conditions in section 212 in the conjunctive, all three conditions must be satisfied for the independent-contractor exemption to apply. *AFM Messenger Service, Inc.*, 198 Ill. 2d at 397. The burden of proof is placed upon the party seeking the exemption. *AFM Messenger Service, Inc.*, 198 Ill. 2d at 397-98.

Here, the Director's finding that the couriers were free from direction or control, and therefore, that CMS satisfied the condition in section 212(A), is not contested by the Department. Rather, CMS challenges the determination that the couriers are employees under sections 212(B) and (C).

On appeal, CMS first contends the court's affirmance of the Director's decision is clearly erroneous because the Director's decision is contrary to the result mandated by *United Delivery Service*.

■ As a preliminary matter, we address the Department's request that we disregard the portions of CMS' appellate brief which challenge the circuit court's decision rather than the Director's supplemental decision. The Department bases its request on the established principle that this court reviews the administrative agency's decision and not that of the circuit court. See *National Data Services of Chicago, Inc. v. Director of Employment Security*, 319 Ill. App. 3d 25, 29, 746 N.E.2d 40 (2001); *AFM Messenger Service, Inc. v. Department of Employment*

*Security*, 315 Ill. App. 3d 308, 312, 733 N.E.2d 749 (2000), *aff'd*, 198 Ill. 2d 380 (2001).

While that is true, CMS points out in reply that the Department does not identify which particular portions of its brief the Department believes to be misfocused. Further, CMS maintains that it challenges both the Director's and the circuit court's decisions, which it perceives to be largely "one and the same" in reasoning. Therefore, we deny the Department's request to disregard such portions of CMS' brief.

At this juncture, we address the Department's request that we also strike or disregard portions of the statement of facts in CMS' brief as violative of Supreme Court Rule 341(e)(6). 188 Ill. 2d R. 341(e)(6). The Department asserts that certain portions of CMS' statement of facts are either unsupported by citations to the record or are argumentative, inaccurate and unfair, or both. We acknowledge the rule's requirement that facts be stated accurately, without argument or comment, and with appropriate references to the record (see 188 Ill. 2d R. 341(e)(6)), but note that the facts necessary to our disposition are essentially undisputed. Therefore, we will not strike or disregard the objected-to portions of CMS' fact statement.

Before considering the merits of CMS' argument, we must determine the applicable standard of review.

The standard applied on review of an agency's decision depends upon whether the issue presented is one of fact or of law. *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 369, 776 N.E.2d 166 (2002); *AFM Messenger Service, Inc.*, 198 Ill. 2d at 390. Purely factual findings made by an administrative agency are reviewed under a manifest weight of the evidence standard. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 369. Under such review, the agency's findings are entitled to deference, being deemed *prima facie* true and correct. See 735 ILCS 5/3—110 (West 2002); *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 369; *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204, 692 N.E.2d 295 (1998).

Where the agency's decision involves a pure question of law, however, the decision is not entitled to the same degree of deference, but is instead reviewed *de novo*. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 369; *City of Belvidere*, 181 Ill. 2d at 205.

Where the fact finder examines the legal effect of a given set of facts, it decides a mixed question of law and fact, which is subject to an intermediate standard of review. See *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 369; *City of Belvidere*, 181 Ill. 2d at 205. Under such circumstances, the decision is based on fact-finding that is inseparable from the application of law to fact and is reviewed under a clearly erroneous standard. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 369; see *AFM*

*Messenger Service, Inc.*, 198 Ill. 2d at 391. This standard is largely deferential to the agency decision. *AFM Messenger Service, Inc.*, 198 Ill. 2d at 395. Under this standard, a reviewing court reverses an agency decision only if, after review of the entire record, the court is left with the " 'definite and firm conviction' " that a mistake was committed. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 369, quoting *AFM Messenger Service, Inc.*, 198 Ill. 2d at 395, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

■ CMS and the Department agree that the question of whether the couriers were employees or independent contractors under section 212 of the Act presents a mixed question of fact and law. To that extent, the parties agree that we review whether the Director's supplemental decision was clearly erroneous. See *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 369. Yet, CMS appears to contradict itself by urging at the same time that we review *de novo* the Director's interpretation of applicable legal standards under section 212(B) of the Act as a pure question of law. CMS' position is based on its assertion that the Director—as well as the court—ignored the binding precedent set forth in *United Delivery Service*. Because the Director's supplemental decision that the couriers were employees under section 212(B) of the Act involves the legal effect of a given set of facts, it decides a mixed question of law and fact. Therefore, the clearly erroneous standard is appropriate for review of the Director's supplemental decision.

At issue, then, is whether the facts in the instant case support a finding that the couriers were independent contractors. Because there is no dispute that the couriers were free from direction or control, we begin our inquiry with the determination made under section 212(B).

The two factors in section 212(B) are stated in the alternative: section 212(B) is satisfied if the service is either outside the usual course of business of the employing unit or if it is performed outside of all the places of business of the employing unit. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 383-84.

The Director found it undisputed that couriers performed services that were integral to and within the usual course of CMS' messenger service business.

The Department asserts that CMS waived any argument concerning the first factor of section 212(B) and CMS essentially agrees. Rather, CMS maintains that we need not consider whether the couriers' services were performed outside the usual course of business because those services were performed outside the places of its business. CMS further contends that consideration of the place of business factor of section 212(B) is controlled by *United Delivery Service*.

In *United Delivery Service*, the court found that although the drivers for a messenger delivery service made their deliveries within the usual course of the business, their services were not performed within the place of its business. *United Delivery Service*, 276 Ill. App. 3d at 588-89. This result departs from the line of cases, beginning with *Rozran*, which generally involve messengers or drivers and which extend the section 212(B) place of business beyond the office premises of the employing unit to any location where the business' interests are represented. In fact, *Rozran* was the first of two earlier messenger service cases, followed by *Zelney v. Murphy*, 387 Ill. 492, 56 N.E.2d 754 (1944), which the *United Delivery Service* court did not address. Therefore, we briefly consider those cases first.

In *Rozran*, the supreme court found a driver for a messenger service to be an employee rather than an independent contractor. *Rozran*, 381 Ill. at 105. There, the driver used his own truck to make deliveries and he paid his own operating expenses. The driver was not required to report to the company at any particular time or on any particular day, and at times, he would receive directions for the pickup of packages by telephoning in to the office. Further, the driver was not required to make the deliveries in any particular manner, but was given packages to deliver to various locations in the Chicago metropolitan area. His territory, or assignment area, would differ from day to day. The court concluded that the driver's services were not performed outside of all the places of business of the messenger service because he in fact reported to the offices every day, received instructions from the dispatcher, secured the load for the truck on the premises, and returned collections and money received to the company office. *Rozran*, 381 Ill. at 104-05.

Likewise, in *Zelney*, under similar facts, the court relied upon *Rozran* to find drivers for a package delivery service to be employees rather than independent contractors. *Zelney*, 387 Ill. at 505. There, the court did not engage in a separate discussion of the place of business factor, but found generally that the individuals did not come within the Act's exceptions for independent contractors. *Zelney*, 387 Ill. at 505.

Years later, in *O'Hare-Midway Limousine Service, Inc. v. Baker*, 232 Ill. App. 3d 108, 596 N.E.2d 795 (1992), this court reached a result consistent with the earlier supreme court cases when it found that limousine chauffeurs were not independent contractors. *O'Hare-Midway*, 232 Ill. App. 3d at 114. There, the court found none of the three conditions for the employment exemption in section 212 of the Act had been satisfied. *O'Hare-Midway*, 232 Ill. App. 3d at 113-14.

The limousine chauffeurs in *O'Hare-Midway* leased their vehicles

from the company, which booked reservations and dispatched the drivers. The chauffeurs were required to dress in dark business suits. They received some instruction from the company, but set their own work schedules and could decline a dispatch. However, the company retained the right to stop leasing the limousines and did terminate leasing arrangements if calls were declined regularly. Although the company paid certain expenses, including insurance and license fees, the chauffeurs bore the cost of gas, tolls, and car washes.

In its discussion of section 212(B), the court focused only on the usual course of business factor, but its analysis considered the location of the services performed. The limousine company asserted that it was merely the provider of dispatch, booking, and billing services, which it offered from a suburban office location, and it claimed that the chauffeurs performed their services outside the usual course of that business. The court rejected that argument, finding that, because the chauffeurs represented the interests of the company whenever they picked up passengers, the usual course of business was on the roadways traveled. *O'Hare-Midway*, 232 Ill. App. 3d at 113.

In contrast, in *United Delivery Service*, upon which CMS relies, the court concluded that drivers for a messenger delivery service were not employees, but were independent contractors. *United Delivery Service*, 276 Ill. App. 3d at 589.

The facts in *United Delivery Service* were substantially similar to those in the earlier delivery and driver cases. For example, like the drivers in *Rozran*, the *United Delivery Service* drivers, who were hired to pick up packages at one location and deliver them to another, were not held to a quota or work schedule and were free to decline delivery jobs. Some drivers received assignments by initiating calls to the company, while others carried pagers or radios. Like the chauffeurs in *O'Hare-Midway*, the drivers entered into an equipment lease with the company for use of their automobiles; similarly, too, the drivers paid their own operating expenses, including gas and tolls. Although the company did not require the drivers to wear uniforms, some drivers rented or purchased uniforms from the company.

After finding the drivers free from direction under section 212(A) of the Act, the *United Delivery Service* court discussed both factors under section 212(B). First, the court found that the drivers' services were performed in the usual course of business. *United Delivery Service*, 276 Ill. App. 3d at 588-89. In considering the second factor, the court noted that the drivers were not required to report to the company offices at any time, nor attend any meetings, but instead, they picked up packages from customers and could submit delivery tickets to the company by mail. *United Delivery Service*, 276 Ill. App.

3d at 589. The court rejected the Department's argument that, as in *O'Hare-Midway*, the roadways were the usual place of business for the delivery service. *United Delivery Service*, 276 Ill. App. 3d at 589. In so doing, the court concluded that the drivers did not represent the company when making their deliveries, for the following three reasons: (1) the drivers drove their own cars;[1] (2) the drivers were not required to wear uniforms; and (3) the drivers were not required to state that they represented the company. *United Delivery Service*, 276 Ill. App. 3d at 589. In distinguishing *O'Hare-Midway*, the court specifically noted that the chauffeurs there leased the limousines from the company and were required to wear a dark business suit and a tie when driving. *United Delivery Service*, 276 Ill. App. 3d at 589.

As noted earlier, in reaching its contrary conclusion, the *United Delivery Service* court did not address the two supreme court cases, *Rozran v. Durkin*, 381 Ill. 97 (1942), or *Zelney v. Murphy*, 387 Ill. 492 (1944), which involve messenger service drivers who were determined to be employees rather than independent contractors.

Not long after *United Delivery Service* was decided, the court again dealt with section 212(B) as applied to drivers for a messenger delivery service. In *AFM Messenger Service, Inc.*, the delivery drivers, like those in previous cases, engaged in the pickup and delivery of parcels to customers; they too were free to decline assignments and were not under certain restrictions as to the completion of assignments. Likewise, the AFM Messenger Service drivers received their assignments either by telephone, pager or radio, and were not required to turn in their delivery tickets to the office in person, but could mail them in. These drivers, like those in *O'Hare-Midway* and *United Delivery Service*, were required to lease their equipment from the company, and they too paid for most of the operating expenses of the vehicles.

Additionally, the drivers displayed a sign in their vehicles, in conformity with regulatory requirements, stating that the vehicle was under lease to the company. When the drivers arrived at the customers' premises, they announced to the customers that they were from AFM. However, they were not required to wear the company-provided caps with company identification. Further, the company acknowledged that the drivers' "offices" were their vehicles. *AFM Messenger Service, Inc.*, 315 Ill. App. 3d at 311.

The court here, unlike *United Delivery Service*, first found that

---

[1]But see *United Delivery Service*, 276 Ill. App. 3d at 586 ("[e]ach driver entered into an equipment lease with [the company], for the use of the driver's automobile").

the company exercised sufficient control over the drivers to preclude it from claiming that its drivers were independent contractors under section 212(A). *AFM Messenger Service, Inc.*, 315 Ill. App. 3d at 315. Even having so determined, the court briefly discussed the requirements of section 212(B). Again unlike *United Delivery Service*, the court found that the drivers performed their services in the place of business of the company, and thus, the company failed to establish that section 212(B) exempted the drivers. *AFM Messenger Service, Inc.*, 315 Ill. App. 3d at 315.

In addressing section 212(B), the court first noted that the messenger delivery service drivers, unlike the drivers in *United Delivery Service*, announced that they represented the delivery service when making deliveries. *AFM Messenger Service, Inc.*, 315 Ill. App. 3d at 315. The court also noted that the drivers were required to report to the company's offices to pick up their paychecks. *AFM Messenger Service, Inc.*, 315 Ill. App. 3d at 315. The court then found that, for purposes of section 212(B), the roadways were the usual place of business and the usual course of the business was the delivery of packages. *AFM Messenger Service, Inc.*, 315 Ill. App. 3d at 315.

The supreme court ultimately affirmed the result, agreeing that there was no clear error in the determination that the drivers were employees rather than independent contractors. *AFM Messenger Service, Inc.*, 198 Ill. 2d at 398. However, the court confined its discussion to the third condition for exemption from employment, set forth in section 212(C). *AFM Messenger Service, Inc.*, 198 Ill. 2d at 398-99. In the course of its analysis under section 212(C), the court discussed the company's argument based on *United Delivery Service*, but found the opinion unpersuasive. *AFM Messenger Service, Inc.*, 198 Ill. 2d at 406-07. The court specifically noted *United Delivery Service*'s failure to consider *Rozran* and *Zelney*, its only published cases involving the status of messenger service drivers under section 212 of the Act. *AFM Messenger Service, Inc.*, 198 Ill. 2d at 406-07. The court overruled *United Delivery Service* "to the extent [it] conflicts with [the instant] decision" but expressed no opinion as to the *United Delivery Service* analysis "concerning sections 212(A) and (B) of the Act." *AFM Messenger Service, Inc.*, 198 Ill. 2d at 407.

More recently, the supreme court again addressed the requirements of section 212 when it considered whether carpet measurers and installers were employees or independent contractors. In *Carpetland U.S.A., Inc.*, the court upheld the Director's determination that the measurers were employees, but reversed the decision as to the installers. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 354. After finding the determination under section 212(A) erroneous as to both the measur-

ers and installers, the court discussed both factors of section 212(B). *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 383-84.

After a lengthy discussion, the court determined that the Director's decision regarding carpet installation and the company's usual course of business was clearly erroneous. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 387. Rather, it found that the company met its burden under the section 212(B) usual course of business factor as to the installers. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 387. However, the court found the situation differed as to the measurers, where the place of business factor was dispositive. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 387-88.

The measurers did jobs that were subcontracted by a sole proprietorship from whom they would receive job assignments. They were trained and paid by the subcontractor, whom they would charge on a per-job basis. The measurers rarely went to the carpet store and no one from the store checked their work. Furthermore, the measurers bore the responsibility for any mistakes they made and would not be paid for a second trip to the customer's premises; instead, they would be paid for the additional work involved only if the mistake was not their fault. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 362-63. In considering the place of employment factor, the court accepted the rationale offered by the Department, agreeing that "the place of business extends to 'any location where workers regularly represent an employer's interest.' " *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 389.

In so doing, the court noted that it applied the same reasoning years earlier in *Eutectic Welding Alloys Corp. v. Rauch*, 1 Ill. 2d 328, 115 N.E.2d 898 (1953), where it held that the assignment of an individual by an employing unit to a specific area for the purpose of selling a product or representing the employing unit's interests was the place of business of the enterprise. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 391, citing *Eutectic Welding Alloys Corp.*, 1 Ill. 2d at 341. Further, the court noted that, "In past cases, this rationale has been utilized when a worker is assigned to a specific geographic area, such as a sales territory or delivery route." *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 391. The court concluded that measurers visiting a customer's premises, like the carpet salespeople who might delegate the task to the measurers, were representing the employing unit's interests when they obtained measurements necessary for the quoting of a price and closing of a sale. *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 391. On that basis, the court held that the premises being measured was the place of business for the purposes of section 212(B). *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 391. Because the measurers represented the company's interest when they visited a customer's premises to take measure-

ments, they provided services at the company's place of business, and, accordingly, the company failed to establish that the measurers were exempt under section 212(B). *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 391.

Here, CMS argues primarily that *United Delivery Service* is binding precedent and compels a finding that the couriers did not perform their services within CMS' place of business. The Department counters that this court should not follow *United Delivery Service* because its analysis is inconsistent with the supreme court's analysis of the same issue in *Carpetland U.S.A., Inc.*, and because the result conflicts with other decisions of this court (in *AFM Messenger Service, Inc.*, 315 Ill. App. 3d 308, 733 N.E.2d 749, and in *O'Hare-Midway*, 232 Ill. App. 3d 108, 596 N.E.2d 795). We agree with the Department.

CMS bases its argument on several factual similarities with *United Delivery Service*. It asserts that: (1) the couriers, like the *United Delivery Service* drivers, pick up packages from one location and deliver them to another; (2) the couriers, like the *United Delivery Service* drivers, were not required to report to the business offices, but could turn in their invoices and receive their pay by mail; and (3) the couriers, again like the *United Delivery Service* drivers, were not required to wear uniforms. CMS asserts that these factual similarities alone make *United Delivery Service* binding on this case. However, CMS does not address the greater factual similarities between its couriers and the drivers in the remaining delivery cases.

None of the asserted factual bases persuade us that *United Delivery Service* is more similar than the remaining cases and must, therefore, be followed. In fact, two of the three asserted similarities are in fact common to most of the delivery messengers and drivers in the other cases, and also to the *Carpetland* measurers.

First, the fact that the couriers here pick up and deliver packages to various locations makes them no more similar to the *United Delivery Service* drivers than to the other delivery drivers or the limousine chauffeurs. Picking up and delivering packages is what delivery drivers and couriers do. The drivers in *Rozran* and *Zelney*, and more recently in *AFM Messenger Service, Inc.*, performed the exact same service. Likewise, the *O'Hare-Midway* chauffeurs picked up passengers and drove them to various locations. Thus, nothing about the function performed by the CMS couriers makes them more similar to or compels a comparison only to the *United Delivery Service* drivers rather than to the other drivers in the entire line of cases.

Next, the same commonality is true of the lack of a requirement here that the couriers report to CMS' office premises. The *Rozran* messengers, as well as the limousine chauffeurs in *O'Hare-Midway*

and the *Carpetland* measurers, were essentially free from any require-
ment to report to the business office premises. Rather, in all instances,
the orders to provide a certain service—package delivery, limousine
rides, or carpet measurement—were received by communicating with
the company's office or dispatcher. Even the AFM messengers, who
were required to report to the company offices to pick up their
paychecks, also received assignments by telephone or pager and could
mail in their delivery tickets rather than take them personally to the
office. In each case, the drivers and measurers were generally free
from any requirement to physically report to the company's premises
in order to perform their work. Therefore, nothing about this makes
the couriers here more like the *United Delivery Service* drivers than
the delivery messengers or drivers in the other cases.

Finally, the lack of a required uniform would not make this case
more similar to *United Delivery Service* than the other delivery driver
cases. In claiming that the couriers were not required to wear a
uniform and, thus, were similar to the *United Delivery Service* drivers,
CMS contests the Director's finding that the identification badges and
patches constituted a uniform. Yet, CMS does not dispute that the
couriers carried and displayed these items of identification. Rather,
CMS claims that, because the identification items were required by
another entity, a building association, the couriers effectively were free
from any company-imposed uniform requirement. However, the couri-
ers' agreement with CMS required that they wear identifying colors
and patches and display identification badges mandated by others.
Because the couriers were required by CMS to wear certain items,
those items may be considered a uniform.

Even if we were persuaded by the distinction CMS asserts concern-
ing the entity imposing the identification requirement, we would not,
however, find the couriers more similar to the *United Delivery Service*
drivers than the drivers in all the other cases on this basis. No men-
tion was made in *Rozran* or *Zelney* of any uniform requirement. The
AFM drivers were provided with caps displaying the company's name
but they were not required to wear them. Furthermore, some *United
Delivery Service* drivers did wear uniforms, although they were not
required to do so.

Whether or not a company requires that a uniform be worn, or a
certain identifying item be displayed, would appear to be more
significant a factor in determining the amount of control or direction
exerted than in determining the employing unit's place of business.
We are not persuaded by CMS' claim that the couriers did not
represent the company's interests because the items of identification
they carried were required "mere[ly]" to comply with the rules of a

building association. As noted earlier, carrying or wearing such items of identification was required also by CMS, since such requirement was included in the couriers' agreement with CMS (providing that they "shall display such I.D. badges" required for access by certain property owners). Rather, we think that, even if no uniform, or identification patch or badge, were required, the couriers would still represent the company's interest when they picked up and delivered packages.

The nature of the package delivery business here, like those in *Rozran* and *Zelney*, requires the couriers to perform their services at various locations. Because the delivery of packages, like the transport of passengers, requires travel from one place to another, the services involved in this function must be performed at various locations. Therefore, we think it logical to conclude that, even without a required announcement identifying the company or required attire, the couriers represent CMS' interests when they provide their services at these various locations. This is consistent with the conclusion reached as to the *Carpetland* measurers, who represented the carpet store whenever they went to a customer's premises, even though they did not wear uniforms or make a formal announcement that they represented the company. See *Carpetland U.S.A., Inc.*, 201 Ill. 2d at 391.

Furthermore, we are not persuaded by CMS' additional assertion that the couriers here are distinguishable from the *Carpetland* measurers because the couriers, unlike the measurers, performed their services in furtherance of their own interests. The couriers may have advanced their own interests by accepting orders from CMS, in that they made more deliveries and earned more money. While this may be so, it is also certain that the interests of CMS were furthered as well when the deliveries were made. After all, CMS is in the business of providing delivery services. It stands to reason that its interests are furthered when the deliveries are made. Because CMS' interests were furthered by the couriers' performance of their services, the couriers, then, represented the company's interests when they made their deliveries.

Moreover, the lack of a required uniform was only one of three reasons given by the *United Delivery Service* court for its conclusion that the drivers did not represent the company when they made their deliveries. That conclusion was not only contrary to the entire line of cases concerning delivery messengers and drivers, but the reasoning behind it was flawed. The *United Delivery Service* court's conclusion was based in part on the fact that the drivers, unlike the limousine chauffeurs, drove their own cars. *United Delivery Service*, 276 Ill. App. 3d at 589. Yet, this appears to conflict with the statement that each

driver entered into an equipment lease with the company for the use of the driver's automobile. *United Delivery Service*, 276 Ill. App. 3d at 586. Further, as previously noted, the lack of a required announcement or uniform does not distinguish the *United Delivery Service* drivers from the drivers in the earlier cases. Therefore, we do not find reasons given by the *United Delivery Service* court a sound basis to depart from precedent.

Finally, we reject CMS' claim that it is merely a broker of delivery service. This is essentially the same argument that was made by the limousine company and rejected in *O'Hare-Midway*. Here, the usual course of business involved the pickup and delivery of packages by the couriers, similar to the pickup of passengers that was the usual course of business in *O'Hare-Midway*. As we have already noted, the couriers' service is performed by transporting the packages, like the limousine passengers, from one location to another. Again, it stands to reason that the company's interests are represented during the performance of that service and that the place of business includes travel between one location and another. Therefore, the couriers perform their services on the roadways, which are, then, for purposes of section 212(B), the place of business. See *O'Hare-Midway*, 232 Ill. App. 3d at 113.

■ Based on all the foregoing, we do not find clear error in the Director's determination that CMS failed to satisfy the conditions for employment exemption under section 212(B). Because CMS failed to satisfy its burden under section 212(B), it cannot demonstrate that the couriers are exempt from employment. Therefore, we do not address CMS' arguments under section 212(C).

■ Finally, CMS makes several additional arguments, urging that we reverse the Director's supplemental decision due to alleged deficiencies in the audit procedure. CMS asserts that: (1) the auditor predetermined that the couriers were employees, making the audit a "sham"; (2) it (CMS) relied on prior audits to its detriment, meaning that the Department is estopped from concluding the couriers are employees; (3) the Department is also estopped from reaching that conclusion based upon industry practice; and (4) it (CMS) is owed either a credit of more than $5,800, or a complete waiver of all interest owed. Collectively, these arguments lack merit as unsupported by legal authority or proper citation to the record. Therefore, we do not address them.

## CONCLUSION

In sum, we find no clear error in the Director's conclusion that the couriers were employees rather than independent contractors. Ac-

cordingly, we affirm the circuit court's judgment upholding the Director's supplemental decision.

Affirmed.

TULLY and O'MARA FROSSARD, JJ., concur.