2015 IL App (1st) 133227

No. 1-13-3227

Opinion Filed May 7, 2015

FOURTH DIVISION

## IN THE

## APPELLATE COURT OF ILLINOIS

## FIRST DISTRICT

| | |
|---|---|
| L.A. McMAHON BUILDING MAINTENANCE, INC., d/b/a L.A. McMahon Window Washing, | ) Appeal from the ) Circuit Court ) of Cook County, |
| Plaintiff-Appellant, | ) Illinois. ) |
| v. | ) No. 11L51189 ) |
| THE DEPARTMENT OF EMPLOYMENT SECURITY, and JAY ROWELL, Director, the Department of Employment Security, | ) The Honorable ) Robert Lopez ) Cepero, ) Judge Presiding. |
| Defendants-Appellees. | ) |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the Court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff L.A. McMahon Window Washing (McMahon) sought administrative review in the circuit court of Cook County of a decision by defendants Illinois Department of Employment Security (IDES) and its director, Jay Rowell (the Director) (together, the Department), which affirmed the decision of IDES that window washers who performed services for McMahon were employees for purposes of the Illinois Unemployment Insurance Act (the Act) (820 ILCS 405/212 (West 2010)).  Pursuant to an audit and a fact-finding

hearing, the Department determined that McMahon failed to establish that the exemptions from "employment" in section 212 of the Act apply to the workers in question. The circuit court upheld the Director's decision. McMahon appeals, contending the Director and the circuit court erred in their determination that the McMahon workers were "employees" and not "independent contractors" under section 212 of the Act. For the following reasons, we affirm.

¶ 2                                   I. BACKGROUND

¶ 3         McMahon provides window washing services for clients.[1] In 2009, the Department initiated an audit for the years 2006, 2007, and 2008 (the audit period) to determine whether McMahon was required to make unemployment contributions for its window washers. Following the audit, in January 2010, the Department issued a determination that McMahon's window washers were employees and ordered an assessment against McMahon for $64,051 in unpaid employer contributions for the audit period, as well as $35,773 in unpaid interest.

¶ 4         McMahon then filed a protest to the determination and assessment in February 2010, in which it requested an administrative hearing. In its protest, McMahon described itself as "in the business of window washing." It stated:

---

[1]     McMahon characterizes this service in its appellate brief as "operat[ing] a call center *** where predominately residential customers call in to request window washing and gutter cleaning services" and independent contractors perform the window washing services. It also states that "McMahon is in the business of connecting customers of window washing with certain workers which it treats as independent contractors *** to provide window washing." In its protest following the Department's determination that the window washers constituted employees of L.A. McMahon Widow Washing under the Act, however, McMahon characterized its operation as: "McMahon is in the business of window washing. McMahon's customers are residential homeowners. McMahon secures customers through general advertising, word-of-mouth marketing, and repeat business. Customers call McMahon to schedule an appointment for their windows to be washed. *** In the context of its business, McMahon utilizes the services of certain independent contractors to wash its customer's windows."

"In the context of its business, McMahon utilizes the services of certain independent contractors to wash its customer's windows. In general, McMahon has contractual agreements in place with Workers, specifically identifying the relationship between McMahon and individual Workers as that of 'Employer' and 'Independent Contractor' (the 'Agreements'). The Agreements are non-exclusive, and remain in effect until terminated either by completion of a project, or upon cancellation of a project by any party other than McMahon, or by McMahon if either (i) reasonable notice *** is delivered to the Contractor; or (ii) reasonable evidence exists that the services provided by the Contractor are either unsatisfactory, incompetent, unprofessional, or untimely. McMahon does not prevent the Workers from working with any person or entity in addition to, or instead of, McMahon.

The actual work-relationship of McMahon and the Workers functions as follows: First, Workers who are interested in obtaining work from McMahon either call McMahon or go to McMahon's office to see if there are any appointments set. McMahon does not call any Workers, nor contact Workers in any other manner, to arrange for work to be completed. The Workers solicit McMahon for window washing appointments of their own volition. McMahon will then tell an inquiring Worker of any relevant appointment, and offer the Worker the opportunity to take the appointment.

Workers are free to decline any appointment for any reason, whether it be because the Worker does not care for the location of the home, size of the home, the time of the appointment, or any other reason. In fact, Workers often do

decline appointments. When this happens, McMahon offers the appointment to the next inquiring worker. The frequency in which the Workers contact McMahon for work varies by worker; some contact McMahon daily, some contact McMahon weekly, some contact McMahon yearly, and some are more sporadic. McMahon has no requirement for the Workers to contact McMahon at any certain volume or on any certain time table.

After agreeing to work at a specific appointment, a Worker travels to the customer's home within the timeframe quoted to the customer. Workers utilize their own vehicles for transportation, and use their own supplies to complete the work. Workers are not reimbursed for any travel or supply costs. McMahon provides no training to the Workers, and does not direct a specific method of cleaning. Workers are not required to wear a uniform. Workers have their own business cards and advertise their own services in the yellow pages and elsewhere. Workers also hire their own helpers and/or employees, for whom McMahon provides no reimbursement nor supervision or training.

When the work is completed, the Worker invoices the customer. If the customer pays the Worker on-site, the Worker submits the payment to McMahon either in person or through the mail. Otherwise, the customer mails payment to McMahon directly. McMahon then generally splits the payment equally (fifty-fifty) with the Worker. ***

* * *

McMahon also employs workers, separate and apart from the Workers at issue, which it classifies as employees *** [as] office personal. McMahon makes appropriate withholdings with respect to these employees ***."

¶ 5        In September 2010, a representative of the Director conducted an administrative hearing on the protest and objections to the determination and assessment. At the outset of the hearing, the representative told the parties he was looking for answers to three inquiries: (1) the nature of the business; (2) the nature for the services performed by the individuals at issue; and (3) the nature of the relationship between McMahon and the individuals at issue. McMahon presented evidence and testimony from general manager Mark Crane, as well as from two window washers, Henry Garduno and Leon Juarez.

¶ 6        Counsel for McMahon opened his argument saying, "McMahon Window Washing is an Illinois corporation in the business of providing window washing services primarily to residential customers."

¶ 7        McMahon general manager and part owner Mark Crane explained that McMahon has a call center in Schaumburg where mostly residential customers call in to request window washing and yard cleaning services. He explained McMahon takes incoming calls from prospective clients and gives out work to "independent contractors" when those contractors call in and are available for work. There are five employees who work in the Schaumburg office and who are issued W-2 forms, receive employee benefits, vacation, and sick pay. These employees do not perform any window washing. McMahon is a seasonal business, and each year it performs work for 10,000 to 11,000 customers. Crane described the McMahon window washers as independent contractors. The window washers did not receive employee benefits, and their incomes were reported on 1099 forms, used for independent

contractors, to the Internal Revenue Service. However, McMahon keeps a workers' compensation and general liability insurance policy that covers the window washers. The cost to McMahon for that policy was based on the amount of work performed by all window washers. Crane explained that the window washers are required to carry their own policies in addition to the policy carried for them by McMahon.

¶ 8 Crane described McMahon's methodology regarding clients: customers who request window washing services from McMahon call the Schaumburg office and are given a two-hour time slot that is convenient for the customer during which the window washer and possibly his assistants will arrive and begin work. No specific start or end time for the work is given the customer. When the customer calls, Crane gives a price estimate over the phone based on the customer's description of the work to be done. Upon arrival at the customer's home, the window washer verifies the conditions on site and gives the customer an updated, actual price estimate, which the customer is free to accept or refuse.

¶ 9 The window washer arrives on-site carrying a McMahon business card, on the back of which is a price list. Through this price list, in addition to other price list postings, the window washer knows what price should be charged per window. The price list is set by McMahon.

¶ 10 If a window washer is on-site and notices more work that could be done, it is not McMahon's policy that the window washer should drum up more business. However, if, for example, a window washer notices the customer's gutters are full of debris, he might tell the customer the gutters need to be cleaned at some point in the future. If the customer decides he wants the gutters cleaned by the window washer, the customer—not the window washer—

then calls McMahon, is given the price of the gutter cleaning, and McMahon then adds it to the customer's bill. Crane explained:

"MR. CRANE: Well, if [the window washer is] up on the roof and he looks down and sees there some debris in the gutters, he might say to the customer there's some debris in your gutters, somewhere down the road you're going to need to get your gutters cleaned. But he's not here to tell the customer what to do or offer services, he's just there to complete the work that's been given through the office. *** [I]f the customer does want to add something like gutter cleaning to the bill, he must be approved through the office and put on the invoice."

¶ 11 During the audit period, McMahon had 15 to 18 window washing crews, each of which would call in to receive work.

¶ 12 Crane testified that window washers do not receive special training from McMahon. They drive their own vehicles and supply their own equipment. They are not required to wear specific uniforms. The company provides company t-shirts, but does not require the window washers to wear them when working.

¶ 13 Customers pay for window washing services via credit card over the telephone or by giving cash or check to the window washer on-site. If by check, the check is made payable to McMahon Window Washing. If by cash, the window washer delivers the cash by hand or mails it to the Schaumburg office.

¶ 14 When the window washing work is completed, the window washer fills out an invoice provided by McMahon Window Washing and gives copies to both the customer and the Schaumburg office. Window washers are not required to go to the Schaumburg office at any

time, but some do in order to pick up business cards and blank invoices, as well as to drop off cash and check payments.

¶ 15        In order to get paid, the window washer turns in both the invoice and any cash or check payments to the Schaumburg office. McMahon pays the window washers "bi-weekly though a payroll system." Window washers are paid 50% of the total amount billed for the work, based on invoices submitted to the office.

¶ 16        Crane explained that McMahon works on a "good faith" system that the homeowners are going to pay. Therefore, if the window washer has submitted the invoices to McMahon, but the customer has not yet paid, McMahon nonetheless pays the window washer. Additionally, in the "rare" case that a customer refuses to pay the invoice through no fault of the window washer, McMahon nonetheless pays the window washer. If, however, the customer refuses to pay the invoice because he is unhappy with the work done by the window washer, the window washer has the opportunity to return to the site and redo the work on his own time, to the customer's satisfaction, and then get paid. If, however, the customer remains unsatisfied and continues to refuse to pay the invoice, McMahon does not pay the window washer. If a window washer damages something at the customer's property, it is the window washer's responsibility to fix it.

¶ 17        McMahon hires its window washers on a seasonal basis and has them sign an "independent contractor agreement" at the start of each spring window washing season. These agreements remained unchanged during the audit period. McMahon can terminate any window washer with 30 days' written notice.

¶ 18    The independent contractor agreements, samples of which are in the appellate record, stipulate that the window washers must obtain their own workers' compensation, general liability, and general automotive insurance.

¶ 19    Crane testified that, if window washers want to procure other window washing jobs while not on McMahon jobs, they are free to do so. Window washers are only barred from soliciting customers met while working for McMahon.

¶ 20    Each window washer provides his own transportation and is not reimbursed travel costs. McMahon does not provide its window washers with company vehicles or with special decals.

¶ 21    Crane testified that each window washer can hire any assistant or assistants he needs, without control or input from McMahon. McMahon only pays the window washer who signed the contract, and the window washer is responsible for paying any assistants directly.

¶ 22    Garduno and Juarez also testified at the hearing. Both Garduno and Juarez signed the independent contractor agreement form with McMahon, which form required them to obtain their own workers' compensation, general liability, and general automotive insurance. Nonetheless, neither Juarez nor Garduno carried his own insurance during the audit period. Beginning in 2009, however, a number of window washers obtained their own insurance, designating McMahon as the insurance certificate holder.

¶ 23    Garduno testified he has worked as a window washing subcontractor for McMahon for 10 years. When he first started working for McMahon, he was not provided any job training seminars on how to wash windows or clean gutters, but had learned the skills in prior employment. He described how the work is seasonal, and he calls McMahon to see if there is work available. He testified that McMahon does not require a minimum number of hours

from him. Garduno also has other window washing customers beyond those from McMahon, as he has a separate window washing business called Father & Son Window Washing, which he started in 2009. Garduno also worked in a flea market booth doing air brush work and selling tattoo supplies.

¶ 24      Prior to 2009, Garduno referred to his business as Henry's Window Washing. He did not request an employer identification number until 2009, at which time he requested the number "to make [his] company legit," because he had heard from other workers that he should do so. Garduno keeps a list of his own window washing customers, advertises for his own business in the newspaper, and has his own business cards. His company was started in 2009, and Garduno did not testify to whether he actually had business cards or advertised during the audit period. Also in 2009, Garduno began to carry liability insurance for his own company's window washing work.

¶ 25      Garduno testified that, when he does jobs for McMahon, he drives his own vehicle with no special "McMahon" markings on it, is not reimbursed for travel expenses, does not wear a uniform, and brings his own equipment. He explained he knows the McMahon pricing for window washing jobs because it is marked on the McMahon business cards, which he gets from the office. During the busy season, he goes to the McMahon office every week or two, but there is no requirement that he do so.

¶ 26      Juarez testified that he, too, works as a window washer for McMahon. He also has his own window washing business called Leon Juarez Window Washing, for which he has business cards. He purchased his own liability insurance in 2009. He testified he uses his own equipment and does not get reimbursed for travel expenses when on jobs for McMahon.

¶ 27    A recommended decision was issued in March 2011, recommending that the determination be affirmed. In September 2011, the Department issued a final decision of the Director, adopting the recommended decision. McMahon filed a complaint for administrative review in the circuit court. After briefing and oral argument, the court entered an order in September 2013 affirming the Director's decision and entering a final judgment.

¶ 28    McMahon appeals.

¶ 29                                    II.  ANALYSIS

¶ 30    McMahon contends the Director's determination that the workers in question were "employees" rather than "independent contractors" under section 212 of the Act was error. Specifically, McMahon argues that: (1) the workers are free from employer control where they retain the right to control the manner in which the window washing is performed, there are no time constraints on a particular job, workers need not submit time records to McMahon, there is no minimum number of jobs or hours required, they are not reimbursed for equipment, they use their own vehicles, there are no company benefits provided, the workers are not precluded from having their own window washing clients, jobs are not offered based on any particular geographic location, McMahon does not provide training to its window washers, McMahon does not have supervisors for the workers, and there is no set of company rules the workers must follow; (2) the services provided, that is, window washing, took place outside McMahon's place of business where window washers "do not represent the interests" of McMahon because they are not authorized to add services on to a job, are not required to wear a uniform, only carry McMahon business cards for price list purposes rather than to generate business, drive their own vehicles, and only submit invoices

in order to be paid; and (3) the workers are engaged in independently established businesses of their own that are not contingent on McMahon.

¶ 31    The Act provides economic relief to involuntarily unemployed individuals through the collection of compulsory contributions from employers and the payment of benefits to eligible unemployed persons. 820 ILCS 405/100 (West 2010). The main purpose of the Act is to alleviate the economic insecurity and burden caused by involuntary unemployment. 821 ILCS 405/100 (West 2010); *Jones v. Department of Employment Security*, 276 Ill. App. 3d 281, 284 (1995).

¶ 32    "Liability for contributions and eligibility for benefits is dependent, in part, on the existence of an 'employment' relationship." *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 396 (2001); *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 354 (2002) ("Under the Act, an employer's liability for making contributions and an employee's eligibility for benefits is dependent, in part, on the existence of an employment relationship between them."). To determine whether an employment relationship exists, we must consider statutory definitions, which are more inclusive than the common law principles of master and servant and independent contractor. *AFM Messenger Service*, 198 Ill. 2d at 396.

¶ 33    "Employment" is given an expansive definition under the Act to include "any service *** performed by an individual for an employing unit." 820 ILCS 405/206 (West 2010); *AFM Messenger Service,* 198 Ill. 2d at 397. Accordingly, a person who, at common law, would be considered an independent contractor may, under the Act, be considered an employee. *AFM Messenger Service*, 198 Ill. 2d at 396.

¶ 34    Section 212 of the Act provides an exemption from employment for services performed by independent contractors where three conditions are met. Section 212 provides:

"Service performed by an individual for an employing unit, whether or not such individual employs others in connection with the performance of such services, shall be deemed to be employment unless and until it is proven in any proceeding where such issue is involved that—

A. Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

B. Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

C. Such individual is engaged in an independently established trade, occupation, profession, or business." 820 ILCS 405/212 (West 2010).

¶ 35    The Act sets forth the three section 212 conditions in the conjunctive and, therefore, all three conditions must be satisfied for the independent-contractor exemption to apply. *AFM Messenger Service*, 198 Ill. 2d at 398 ("Because the inability to satisfy any one [section 212] condition will defeat an employer's claim for an independent-contractor exemption," the court found it only necessary to consider one section 212 condition.); *Chicago Messenger Service v. Jordan*, 356 Ill. App. 3d 101, 105 (2005). The burden of proof is on the party seeking the exemption. *Chicago Messenger Service*, 356 Ill. App. 3d at 105. Additionally,

"because the Act was passed with the public welfare in mind, its provisions should be liberally construed in favor of inclusion," and its exemption provisions strictly construed against the presumptive employer who claims them. *AFM Messenger Service*, 198 Ill. 2d at 398.

¶ 36 This court reviews the decision of the agency, rather than that of the circuit court. *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 819 (2009). Judicial review of an agency decision extends to all questions of law and fact presented by the record. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). The standard applied on review of an agency's decision depends upon whether the issue presented is one of fact or of law. *Carpetland U.S.A.*, 201 Ill. 2d at 369. Purely factual findings made by an administrative agency are reviewed under a manifest weight of the evidence standard. *Carpetland U.S.A.*, 201 Ill. 2d at 369. Under such review, the agency's findings are entitled to deference, being deemed *prima facie* true and correct. *Carpetland U.S.A.*, 201 Ill. 2d at 369.

¶ 37 Where the agency's decision involves a pure question of law, however, the decision is not entitled to the same degree of deference, but is instead reviewed *de novo*. *Carpetland U.S.A.*, 201 Ill. 2d at 369.

¶ 38 Where the fact finder examines the legal effect of a given set of facts, it decides a mixed question of law and fact, which is subject to an intermediate standard of review. See *Carpetland U.S.A.*, 201 Ill. 2d at 369. Under such circumstances, the decision is based on fact finding that is inseparable from the application of law to fact and is reviewed under a clearly erroneous standard. *Carpetland U.S.A.*, 201 Ill. 2d at 369; *AFM Messenger Service,* 198 Ill. 2d at 391. This standard is largely deferential to the agency decision. *AFM*

*Messenger Service,* 198 Ill. 2d at 395. Under this standard, a reviewing court reverses an agency decision only if, after review of the entire record, the court is " ' "left with the definite and firm conviction" ' " that a mistake was committed. *Carpetland U.S.A.,* 201 Ill. 2d at 369 (quoting *AFM Messenger Service, Inc.*, 198 Ill. 2d at 395, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 39    Our review here is under the clearly erroneous standard, as our supreme court has previously determined that "whether certain workers are independent contractors under section 212 of the Act is such a mixed question of law and fact, subject to review for clear error." *Carpetland U.S.A.,* 201 Ill. 2d at 369 (citing *AFM Messenger Service,* 198 Ill. 2d at 396). An agency decision is clearly erroneous where the entire record leaves the reviewing court with the definite and firm conviction that a mistake has been made. *Hurst v. Department of Employment Security*, 393 Ill. App. 3d 323, 327 (2009).

¶ 40    In the case at bar, we find no clear error in the Department's determination that the window washers were employees of McMahon rather than independent contractors during the audit period of 2006, 2007, and 2008.

¶ 41    First, we note that only the section 212 elements, rather than the fact of the independent contractor agreements between McMahon and the window washers, dictate whether the relationship is that of employer-employee or that of employer and independent contractor. See, *e.g.*, *C.R. England, Inc. v. Department of Employment Security*, 2014 IL App (1st) 122809, ¶ 50 (" 'The terms of the three statutory elements dictate whether the exemption operates, and the designation or description which the parties apply to their relationship is not controlling.' [Citation.]  'Therefore, even though the standard-form contract utilized by the parties in this case purports to be an independent contractor

agreement, that designation does not control.' [Citation.]" *C.R. England*, 2014 IL App (1st) 122809, ¶ 50 (quoting *Cohen Furniture Co. v. Department of Employment Security*, 307 Ill. App. 3d 978, 982 (1999)).

¶ 42      As discussed earlier, section 212 of the Act sets forth three requirements for the independent-contractor exemption to apply here:  (1) the window washers were free from McMahon's control or direction over the performance of their services; (2) the services the window washers provided were outside the usual course of McMahon's business or were performed outside all McMahon's places of business; and (3) the window washers were engaged in independently established trades, occupations, professions, or businesses.  820 ILCS 405/212 (West 2010); *C.R. England*, 2014 IL App (1st) 122809, ¶ 50.

¶ 43      In this case, the Department found that McMahon failed to meet its burden as to all three conditions of section 212, and McMahon now contests the Department's decision as to all three section 212 exemption factors.  However, because the inability to satisfy any one section 212 condition will defeat McMahon's claim for an independent-contractor exemption, it is not necessary for us to consider whether all three conditions have been satisfied. See *AFM Messenger Service*, 198 Ill. 2d at 398 ("Because the inability to satisfy any one [section 212] condition will defeat an employer's claim for an independent-contractor exemption," the court found it only necessary to consider one section 212 condition.).  We elect to consider here the second condition (section 212(B)), which requires McMahon to prove that the window washers' services were either outside McMahon's usual course of business or performed outside all of McMahon's places of business.  820 ILCS 405/212(B) (West 2010).

¶ 44      Section 212(B) of the Act provides:

"§ 212. Service performed by an individual for an employing unit, whether or not such individual employs others in connection with the performance of such services, shall be deemed to be employment unless and until it is proven in any proceeding where such issue is involved that—

\*\*\*

B.  Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed[.]"  820 ILCS 405/212(B) (West 2010).

As the two factors set forth in section 212(B) are in the alternative, McMahon need only demonstrate the existence of one to satisfy section 212(B).

¶ 45       We first address whether McMahon proved the first factor in section 212(B), that is, that the window washers' services were outside McMahon's usual course of business.  The Director found that the window washers' services were not outside McMahon's usual course of business.  To determine whether services fell outside McMahon's usual course of business, "the key to this inquiry is whether the services are necessary to the business of the employing unit or merely incidental."  *Carpetland U.S.A.,* 201 Ill. 2d at 386.  Here, we find no clear error in the Director's determination that the window washers' services in washing windows for McMahon Window Washing were not outside McMahon's usual course of business, where McMahon's window washing business would not exist without window washers to

wash windows. Accordingly, we find that McMahon failed to prove the first factor in section 212(B)'s exemption for independent contractors.

¶ 46    Next, we address whether McMahon proved the second factor in section 212(B)'s exemption for independent contractors, that the window washers' services were provided outside of all McMahon's places of business. An employing unit's place of business extends to any location where workers regularly represent its interests. *Carpetland U.S.A.*, 201 Ill. 2d at 391. In *Carpetland U.S.A.*, our supreme court addressed the requirements of section 212 when it considered whether carpet measurers and installers were employees or independent contractors, upholding the Director's determination that the measurers were employees, but reversing the Director's determination as to the installers. *Carpetland U.S.A.*, 201 Ill. 2d at 354. After finding the determination under section 212(A) erroneous as to both the measurers and the installers, the court discussed both factors of section 212(B). *Carpetland U.S.A.*, 201 Ill. 2d at 383-84.

¶ 47    Following a lengthy discussion, the *Carpetland U.S.A.* court determined that the Director's decision regarding carpet installation and the company's usual course of business was clearly erroneous. *Carpetland U.S.A.*, 201 Ill. 2d at 387. It found the company had met its burden under the section 212(B) usual course of business factor as to the installers, but not as to the measurers. *Carpetland U.S.A.*, 201 Ill. 2d at 387. Regarding the measurers, the court found the place of business factor was dispositive. *Carpetland U.S.A.*, 201 Ill. 2d at 387-88.

¶ 48    The measurers' jobs were subcontracted by a sole proprietorship from which the measurers would receive job assignments. The measurers were trained and paid by the subcontractor, whom they charged on a per-job basis. The measurers rarely went to the

carpet store, and no one from the store checked their work. Additionally, the measurers bore the responsibility for any mistakes they made and would not be paid for a second trip to the customer's premises. The measurers were only paid for the additional work involved if the mistake was not their fault. *Carpetland U.S.A.*, 201 Ill. 2d at 362-63. In considering the place of employment factor, the *Carpetland* court accepted the rationale offered by the Department, agreeing that "the place of business extends to 'any location where workers regularly represent an employer's interest.' " *Carpetland U.S.A.*, 201 Ill. 2d at 389. The court stated:

> "When a Carpetland salesperson visits a customer's premises to obtain measurements necessary for the quoting of a price and the closing of a sale, he is 'representing his employing unit's interest.' So, too, is a measurer to whom the salesperson might delegate this task. As a result, the premises being measured are Carpetland's place of business for purposes of section 212(B). We, therefore, conclude that because the measurers are representing Carpetland's interest when they visit a customer's premises to take measurements, they are providing services at Carpetland's place of business." *Carpetland U.S.A.*, 201 Ill. 2d at 391.

¶ 49        We are unable to say here that the Director's determination was clearly erroneous such that we are left with the definite and firm conviction that a mistake has been made where the record shows the window washers were representing McMahon's interests when on job locations such that, when visiting the customers locations to provide window cleaning services, they were providing these services at McMahon's place of business. This is particularly evidenced by the fact the window washers carried McMahon business cards to

their work sites. Although McMahon argues that these business cards were only for pricing purposes, they had pricing on one side and McMahon information on the other. Workers also carried with them and provided to customers McMahon Window Washing invoices. Additionally, the workers provided window washing services to McMahon's specifications, that is, if a customer complained about the quality of window washing, McMahon would not pay the window washer until that window washer had returned to the site on his own time to fix the problem.

¶ 50    The nature of the window washing business requires window washers to perform their services at customers' residences. We think it is logical to conclude that, although they are not required to wear a McMahon uniform, the window washers represent McMahon's interests when they provide window washing services at customers' homes, provide customers with McMahon business cards and McMahon invoices, and provide window washing services to customers' and McMahon's specifications. Accordingly, McMahon's place of business extended to all the locations where the window washers provided window washing services for McMahon. Thus, McMahon failed to meet the second condition for finding that the workers were independent contractors under section 212(B), specifically, McMahon failed to prove that the workers' services were performed outside all of McMahon's places of business.

¶ 51    The Department urges us to hold that any time workers for a business travel to perform services, the travelling workers are always representing the company's interests under section 212(B) of the Act and, therefore, are automatically employees rather than independent contractors. We decline to give such a broad reading to section 212. Our holding here is limited to the facts of this particular case where, because the window washers represented

McMahon's interests when they worked on-site at customers' homes, under section 212(B) of the Act, McMahon's place of business extended to those customers' homes. See also 56 Ill. Adm. Code 2732.200(f)(2) ("Because services are performed outside the employing unit's premises does not preclude an individual from being found to be in employment. This decision is based upon the occupation and the *factual context* in which the services are performed." (Emphasis added.)).

¶ 52    Because McMahon failed to satisfy its burden under section 212(B), the Director's finding that the workers were employees of McMahon, and not independent contractors, was not clearly erroneous.

¶ 53                              III.  CONCLUSION

¶ 54    For all of the foregoing reasons, we find no clear error in the Director's conclusion that the window washers were employees rather than independent contractors. Accordingly, we affirm the circuit court's judgment upholding the Director's decision.

¶ 55    Affirmed.