# Illinois Official Reports

## Appellate Court

***C.R. England, Inc. v. Department of Employment Security,***
**2014 IL App (1st) 122809**

| | |
|---|---|
| Appellate Court Caption | C.R. ENGLAND, INC., a Foreign Corporation, Plaintiff-Appellee, v. THE DEPARTMENT OF EMPLOYMENT SECURITY, an Administrative Agency of the State of Illinois, MAUREEN T. O'DONNELL, DIRECTOR OF EMPLOYMENT SECURITY, an Administrative Agency of the State of Illinois; RONALD S. RODGERS, Representative of the Director of Employment Security, an Administrative Agency of the State of Illinois, Defendants-Appellants.–C.R. ENGLAND, INC., a Foreign Corporation, Plaintiff-Appellee, v. THE DEPARTMENT OF EMPLOYMENT SECURITY, an Administrative Agency of the State of Illinois; THE DEPARTMENT OF EMPLOYMENT SECURITY, BOARD OF REVIEW, an Administrative Agency of the State of Illinois; MAUREEN T. O'DONNELL, Director of Employment Security, an Administrative Agency of the State of Illinois, Defendants-Appellants. |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-12-2809, 1-12-2811 cons. |
| Filed | March 14, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Board of Review of the Department of Employment Security properly found that plaintiff was the chargeable last employer of claimant, a truck driver seeking unemployment benefits, that claimant was discharged by plaintiff for reasons other than employment-related misconduct, and that he was entitled to unemployment benefits, since plaintiff failed to establish that the services claimant provided were performed outside all of plaintiff's places of business and the finding that claimant was an employee of plaintiff and not an independent contractor was not clearly erroneous, and, likewise, the finding that claimant was discharged for having an accident that was due to negligence and not deliberate misconduct or a willful refusal to follow instructions also was not clearly erroneous. |

| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 11-CH-16972, 11-CH-14681; the Hon. Margaret Ann Brennan, Judge, presiding. |
|---|---|
| Judgment | Circuit court reversed; Director and the Board of Review affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Chicago (Ann C. Maskaleris, Assistant Attorney General, of counsel), for appellants. |
| | Johnson & Bell, Ltd., of Chicago (Robert M. Burke, Frank R. Grenard, Garrett L. Boehm, Jr., and Michael J. Linneman, of counsel), for appellee. |
| | Scopelitis Garvin Light Hanson & Feary, of Chicago (William D. Brejcha, of counsel), for *amici curiae*. |
| Panel | PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion. Justices Hall and Reyes concurred in the judgment and the opinion. |

**OPINION**

¶ 1     In case number 11 CH 16972, plaintiff, C.R. England, Inc. (CRE), sought administrative review of a decision by the Director of the Illinois Department of Employment Security (the Department) finding that CRE was the chargeable last employer for William Park's claim for unemployment insurance benefits. In case number 11 CH 14681, CRE also sought administrative review of a decision by the Department's board of review (Board of Review) finding that Mr. Park was eligible for unemployment insurance benefits under section 602(A) of the Unemployment Insurance Act (the Act) (820 ILCS 405/602(A) (West 2010)) because he was discharged by CRE for reasons other than employment-related misconduct. The circuit court reversed both decisions. Defendants, the Board of Review, Maureen T. O'Donnell, Director (Director) of the Department, and Ronald S. Rodgers, representative of the Director of the Department, filed this consolidated appeal from the circuit court's orders reversing the Director and the Board of Review. We reverse the circuit court's orders in both case number 11 CH 16972 and case number 11 CH 14681 and affirm the Director and the Board of Review.

¶ 2     Mr. Park, an over-the-road truck driver, hauled freight for CRE, a national trucking company, pursuant to an "independent contractor operating agreement" (agreement) entered into between them on March 2, 2010. On May 13, 2010, Mr. Park was hauling a trailer for

CRE's customer, Walmart, and as he turned from the highway into a parking lot, he struck a utility pole causing thousands of dollars of damage to Walmart's trailer for which CRE had to pay. As a result of the accident, on May 14, 2010, CRE's safety department disqualified Mr. Park from further driving for CRE, and CRE terminated the agreement with him. Mr. Park thereafter applied for unemployment insurance benefits.

¶ 3 A Department claims adjuster found that CRE was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits. CRE protested, contending it was not the chargeable last employer because Mr. Park's services for CRE were excluded from the Act's definition of "employment," given that Mr. Park's relationship with CRE was that of an independent contractor, not an employee. CRE also contended Mr. Park was ineligible for unemployment insurance benefits because he was discharged for employment-related misconduct under section 602(A) of the Act (820 ILCS 405/602(A) (West 2010)).

¶ 4 The administrative proceedings on the "chargeable last employer" issue were separate from those on the employment-related-misconduct issue. The facts relative to each issue are as follows.

¶ 5 I. The "Chargeable Last Employer" Issue

¶ 6 A. Evidence Adduced During the Administrative Hearing

¶ 7 CRE administratively appealed the claims adjustor's decision that it was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits and the matter was heard by the Director's representative during a January 2011 hearing. At the beginning of the hearing, the Director's representative explained that the issues relevant to determining whether CRE was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits included: (1) whether Mr. Park's services for CRE constituted "employment" under section 206 of the Act (820 ILCS 405/206 (West 2010)); and (2) whether Mr. Park's services for CRE were excluded from the Act's definition of "employment" under the exemptions in section 212 of the Act (820 ILCS 405/212 (West 2010)), relating to independent contractors, or section 212.1 of the Act (820 ILCS 405/212.1 (West 2010)), relating to truck owner-operators.

¶ 8 The hearing proceeded and CRE presented one witness, Tricia O'Neal, then-Director of CRE's independent contractor division. The following evidence was adduced during the hearing via Ms. O'Neal's testimony and admitted exhibits.

¶ 9 CRE, a Utah corporation headquartered in Salt Lake City, is a freight-hauling trucking company that operates in 48 states, as well as Canada and Mexico. CRE is a motor carrier with an authority issued by both the United States Department of Transportation and the Illinois Commerce Commission, and is licensed by the Federal Motor Carrier Safety Administration. As such, CRE is an authorized carrier in Illinois. In December 2010, CRE opened an Illinois office in the Chicago area.

¶ 10 In mid-November 2009, Mr. Park entered into a student training agreement with CRE in order to learn how to drive a truck and haul freight. During his training period, which lasted until March 2, 2010, CRE acknowledged him as its employee, as it hired and trained him, and paid and issued him a W-2 tax form.

¶ 11 The training program consisted of two phases. During phase one, Mr. Park had on-the-job training, under the auspices of a certified driving trainer, and completed a road evaluation and certification program. Mr. Park completed phase one in mid-December 2009.

¶ 12        During phase two, Mr. Park was assigned as a second seat to an "independent contractor" driver and was paid by CRE on a per mile basis. The student training agreement specified that at the conclusion of phase two, Mr. Park could choose one of the following career paths: (1) become an independent contractor and begin his own business; (2) become an independent contractor and a trainer in the second phase of CRE's training program; (3) remain a CRE employee as a second seat with an independent contractor; or (4) remain a CRE employee with a company truck.

¶ 13        Mr. Park completed phase two of his training in late February 2010 and then resigned his position as a CRE employee to become an independent contractor under the first "career path" designated in the student training agreement. On March 2, 2010, Mr. Park entered into the independent contractor operating agreement (agreement). Ms. O'Neal confirmed that the agreement was prepared "by or at the behest of [CRE]" and that she went over its provisions and ensured that it was executed. She explained that CRE has a computer program that produced the agreement, and the agreement entered into between CRE and Mr. Park was the same one CRE enters into with any driver who wishes to become an independent contractor, with the driver's specific information inserted therein. For example, the agreement named Mr. Park and included his personal information, including his address in Glendale Heights, Illinois. The agreement referred to Mr. Park as "YOU" or "CONTRACTOR," and CRE as "WE" or "OUR." Its preamble provided that CRE "wish[es] to utilize independent contractors to assist in OUR motor carrier business"; that Mr. Park possesses equipment "which is suitable for use in OUR business"; and that Mr. Park is "willing to perform personally *** certain functions related to the operation of the equipment in OUR business."

¶ 14        The agreement provided that it could be terminated by either CRE or Mr. Park at any time and for any reason upon 30 days' written notice to the other. The agreement also contained a choice of law provision, stating: "This Agreement shall be interpreted under the laws of the United States and the State of Utah, without regard to the choice-of-law rules of such State or any other jurisdiction."

¶ 15        In order to drive for CRE, Mr. Park needed to lease or buy a truck that complied with CRE's weight, length and age requirements. On March 2, 2010, Mr. Park leased a truck from Opportunity Leasing, Inc., d/b/a Horizon Truck Sales and Leasing (Horizon). Ms. O'Neal confirmed that CRE and Horizon have the same street address and post office box mailing address in Salt Lake City. Ms. O'Neal acknowledged that a 2001 decision from the Utah Department of Workforce Services stated that Horizon was "a company owned and operated by [CRE]." Ms. O'Neal testified that to the best of her knowledge nothing changed relative to the relationship between CRE and Horizon from 2001 to the time Mr. Park leased his truck from Horizon in 2010. However, she subsequently testified that she had no knowledge as to whether CRE owns Horizon and she testified that CRE and Horizon are separate corporations.

¶ 16        Under federal law (see 49 C.F.R. § 376.1 *et seq.* (2012)), in order to operate the truck on behalf of CRE, Mr. Park had to lease the truck back to CRE, as the licensed carrier that has the federal and state issued motor carrier authority. Accordingly, the agreement contained a provision noting that Mr. Park leased the truck to CRE and would operate under CRE's motor carrier authority. However, Mr. Park could contract with other motor carriers and drive for them in addition to CRE.

¶ 17        Once Mr. Park executed the agreement with CRE, leased the truck from Horizon, and leased the truck back to CRE, he began hauling freight for CRE. Mr. Park worked for CRE's

"dedicated division," driving a "dedicated route" for CRE's "dedicated account," Walmart, five to six days each week. Walmart would inform CRE about the load to be transported and the times at which it was to be picked up and then delivered, which a CRE driver manager would communicate to Mr. Park when offering him the load. Mr. Park would report to the Walmart distribution center in Sterling, Illinois, where he attached his truck to a Walmart trailer and then transported it to an assigned transportation point, either another Walmart distribution center or a Walmart retail store in Illinois or another state.

¶ 18    Ms. O'Neal testified that Mr. Park set his own work hours by being available for loads and then either accepted or rejected them when offered by CRE. Once Mr. Park accepted a load, he chose his own route between the pickup and delivery points, and was paid per mile based on an industry-standard rate. The agreement contained certain requirements that Mr. Park had to abide by in terms of loading and unloading freight, such as when he could and could not use the services of a "lumper," someone to help load and unload freight.

¶ 19    CRE's independent contractors, including Mr. Park, were paid $0.80 to $1.53 per mile, while its acknowledged employee drivers were paid $0.25 to $0.49 per mile. Independent contractors were paid more per mile than acknowledged employee drivers because they were not entitled to company benefits (*i.e.*, insurance, paid vacations, retirement plan) and were responsible for certain business expenses.

¶ 20    Various provisions of the agreement described the expenses for which Mr. Park was responsible, including workers' compensation insurance, vehicle insurance, vehicle maintenance and repairs, drivers license fees and permits, and costs related to operating and licensing the truck. However, CRE provided Mr. Park with certain financial assistance and equipment. Specifically, under the agreement, CRE reimbursed Mr. Park 100% for tolls he paid while operating in Illinois and other specified states. Also, Mr. Park participated in CRE's "fuel cap program," which allowed him to pay a discounted price for fuel used in hauling freight for CRE. And, CRE provided and installed satellite communications equipment in Mr. Park's truck and paid all messaging usage charges so that he could communicate with CRE's driver managers.

¶ 21    In addition, CRE put programs in place to assist Mr. Park in securing health insurance, truck and liability insurance, and occupational accident insurance. CRE offered a truck investment fund, where it would take out funds from Mr. Park's weekly check in order for him to put a down payment on a truck should he wish to buy one. CRE also advised Mr. Park about a business consulting and tax preparation company for independent contractors called Owner-Operator Solutions, Inc., and pursuant to the agreement he authorized deductions from his weekly check for business consulting, bookkeeping and tax preparation services.

¶ 22    CRE issued Mr. Park a 1099 tax form and he was responsible for filing his own self-employment tax forms as an independent contractor.

¶ 23    After the accident, CRE's safety department disqualified Mr. Park from further driving for it, and then on May 14, 2010, CRE terminated the agreement. That same day, Mr. Park terminated the vehicle lease with Horizon and relinquished possession of the truck.

¶ 24                                    B. The Administrative Decision

¶ 25    The Director's representative issued his recommended decision in which he concluded: (1) Illinois law applied to determine whether CRE was the chargeable last employer for Mr. Park's

claim for unemployment insurance benefits; and (2) for purposes of the Act, Mr. Park was an employee of CRE, not an independent contractor or a truck owner-operator and, therefore, CRE was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits. The Director then issued her decision, adopting and affirming the recommended decision. We will more fully discuss the Director's decision later in this opinion.

## II. Employment-Related-Misconduct Issue

### A. Initial Determination and Evidence Adduced During the Administrative Hearing

CRE protested that Mr. Park was ineligible for unemployment insurance benefits under section 602(A) of the Act (820 ILCS 405/602(A) (West 2010)) because he was discharged for employment-related misconduct. A Department claims adjuster determined that Mr. Park was eligible for unemployment insurance benefits because he was discharged by CRE for an accident, *not* for employment-related misconduct. CRE administratively appealed that decision and the matter was heard by a Department referee during a December 2010 hearing. Three witnesses testified during the hearing: Mr. Park, Ms. O'Neal, and Larry Luke, a member of CRE's safety department.

Mr. Park testified that on May 13, 2010, he was hauling a Walmart trailer for CRE. As he turned from the highway into a parking lot, he did not allow enough room for the trailer to clear a utility pole, and so the back of the trailer hit that pole. Once Mr. Park pulled into the parking lot, he immediately notified CRE and the police of the accident, and subsequently was ticketed by the police for leaving the roadway. That was the first accident he had while driving for CRE.

Mr. Luke testified he spoke with Mr. Park about the accident. Mr. Park told Mr. Luke that he hit the utility pole because he made the turn into the parking lot too sharp and had not looked in his mirror. Mr. Park admitted to Mr. Luke that the accident was his fault and that he had received a ticket. As a result of the accident, CRE was responsible for over $31,000 in damages to Walmart's trailer.

Mr. Luke and Ms. O'Neal testified that on May 14, 2010, Mr. Park was disqualified by the CRE safety department from further driving for CRE as a result of the accident, and that CRE's independent contractor division terminated the agreement that same day.

### B. The Administrative Decision

After the hearing, the referee issued his decision in which he determined that Mr. Park was discharged for reasons other than employment-related misconduct and so was eligible for unemployment insurance benefits under section 602(A) of the Act. CRE administratively appealed that decision to the Board of Review, which affirmed the referee's decision. We will more fully discuss the Board of Review's decision later in this opinion.

### III. The Circuit Court Proceedings

CRE sought administrative review of both decisions, filing a separate complaint for administrative review from each. Case number 11 CH 16972 involved CRE's complaint for administrative review of the Director's decision finding that it was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits. Case number 11 CH 14681 involved CRE's complaint for administrative review of the Board of Review's decision

finding that Mr. Park was eligible for unemployment insurance benefits under section 602(A) of the Act because he was discharged for reasons other than employment-related misconduct. The circuit court denied CRE's motion to consolidate the two cases, but ordered that they proceed together. On August 22, 2012, the circuit court entered its orders: (1) reversing the Director's decision in case number 11 CH 16972 that CRE was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits; and (2) reversing the Board of Review's decision in case number 11 CH 14681 that Mr. Park was discharged for reasons other than employment-related misconduct and, thus, was eligible for unemployment insurance benefits under section 602(A) of the Act.

¶ 36                                    IV. The Consolidated Appeal

¶ 37        Defendants, the Department, Maureen T. O'Donnell, Director of the Department, and Ronald S. Rodgers, representative of the Director of the Department, timely appealed from the circuit court order in case number 11 CH 16972 reversing the Director. Defendants, the Department, the Board of Review, and Maureen T. O'Donnell, Director of the Department, timely appealed from the circuit court order in case number 11 CH 14681 reversing the Board of Review. The appeals were consolidated. We granted leave to the American Trucking Associations, Inc., the Chamber of Commerce of the United States of America, and the Trucking Industry Defense Association, to file an *amici curiae* brief in support of CRE[1].

¶ 38        First, we address defendants' appeal from the circuit court's order in case number 11 CH 16972 reversing the Director's finding that CRE was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits. Then we will address defendants' appeal from the circuit court's order in case number 11 CH 14681 reversing the Board of Review's finding that Mr. Park was discharged for reasons other than employment-related misconduct and so was eligible for unemployment insurance benefits under section 602(A) of the Act.

¶ 39        V. The Director's Finding That CRE Was the Chargeable Last Employer for Mr. Park's
                           Claim for Unemployment Insurance Benefits

¶ 40        On administrative review, we review the final decision of the agency, *not* the decision of the circuit court. *Abbott Industries, Inc. v. Department of Employment Security*, 2011 IL App (2d) 100610, ¶ 15. Here, the final administrative decision was the Director's decision on the chargeability issue. Accordingly, we review whether the Director was correct in her decision that CRE was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits. Review of the Director's decision requires us to set forth the pertinent sections of the Unemployment Insurance Act.

¶ 41        "The Unemployment Insurance Act (Act) (820 ILCS 405/100 *et seq.* (West 2000)), adopted in 1937, provides economic relief to those who are involuntarily unemployed, through the collection of compulsory contributions from employers and the payment of benefits to eligible unemployed persons. [Citations.] Liability for contributions and eligibility for benefits is dependent, in part, on the existence of an 'employment' relationship. The determination of whether such a relationship exists is not controlled by common law principles of master and

---

[1]The *amici curiae* brief largely mirrors CRE's arguments and, therefore, will not be separately addressed.

servant and independent contractor. Rather, we must look to the statutory definitions, which are more inclusive than the common law. [Citations.] Thus, a person who is regarded at common law as an independent contractor may nonetheless be considered an employee under the Act. [Citations.]" *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 396-97 (2001).

¶ 42    Section 206 of the Act defines "employment" in relevant part as "any service *** performed by an individual for an employing unit." 820 ILCS 405/206 (West 2010). "Employing unit" includes a corporation such as CRE, "which has or *** had in its employ one or more individuals performing services for it within this State." 820 ILCS 405/204 (West 2010). Section 207 of the Act provides in relevant part:

> "The term 'employment' shall include an individual's entire service, within or both within and without this State, if
>
> ***
>
> B. The service is not localized in any State but some of the service is performed in this State and (1) the base of the operations *** is in this State[.]" 820 ILCS 405/207 (West 2010).

¶ 43    "The expansive definition of 'employment' is circumscribed by section 212 of the Act, which carves out an exemption for services performed by 'independent contractors.' " *AFM*, 198 Ill. 2d at 397. Section 212 states in pertinent part:

> "Service performed by an individual for an employing unit *** shall be deemed to be employment unless and until it is proven in any proceeding where such issue is involved that—
>
> A. Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and
>
> B. Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> C. Such individual is engaged in an independently established trade, occupation, profession, or business." 820 ILCS 405/212 (West 2010).

¶ 44    The Act's expansive definition of "employment" is also circumscribed by section 212.1 of the Act, which carves out an exemption for services performed by truck owner-operators. Section 212.1 states in pertinent part:

> "The term 'employment' shall not include services performed by an individual as an operator of a truck, truck-tractor, or tractor, provided the person or entity to which the individual is contracted for service shows that the individual:
>
> * * *
>
> (6) Maintains a separate business identity, offering or advertising his or her services to the public, by displaying its name and address on the equipment or otherwise." 820 ILCS 405/212.1 (West 2010).

¶ 45    Defendants argue that the Director correctly determined that Mr. Park was an employee of CRE under sections 206 and 207 of the Act in that he performed services for CRE, an employing unit, in Illinois and his base of operations was the Walmart distribution center in

- 8 -

Sterling, Illinois. Defendants argue that Mr. Park did not fall under the section 212 independent contractor exemption or the section 212.1 truck owner-operator exemption and, thus, that CRE was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits. CRE responds that the Act does not apply here because the choice of law provision in the agreement between Mr. Park and CRE provides: "This Agreement shall be interpreted under the laws of the United States and the State of Utah, without regard to the choice-of-law rules of such State or any other jurisdiction." CRE contends that the Director erred in applying the Act here, and that instead she should have applied Utah law to determine Mr. Park's claim for unemployment insurance benefits. CRE argues that the Director's application of the Act, and his failure to apply Utah law pursuant to the choice of law provision in the agreement, violated the right of the parties to freely contract. See U.S. Const., art. I, § 10; Ill. Const. 1970, art. I, § 16. The choice of law determination is a legal issue subject to *de novo* review. *Mendez v. Atlantic Painting Co.*, 404 Ill. App. 3d 648, 650 (2010).

¶ 46     CRE's choice of law contention is without merit. The choice of law provision in the agreement provides that Utah law governs the interpretation of the agreement; pursuant thereto, Utah law would apply if Mr. Park's claim for unemployment insurance benefits was a right provided for in the agreement that was subject to interpretation. However, Mr. Park's claim for unemployment insurance benefits was not a right provided for in the agreement and, thus, was not subject to the agreement's choice of law provision for contract interpretation. Rather, in filing his claim for unemployment insurance benefits, Mr. Park asserted a statutory right under the Act, *not* a contractual right pursuant to his agreement with CRE. Accordingly, the Director correctly looked to the Act (and to Illinois law interpreting the Act) to determine whether CRE was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits.

¶ 47     We proceed to examine whether the Director correctly determined that CRE was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits under the Act. As discussed earlier in this opinion, CRE's liability for contributions under the Act, and Mr. Park's eligibility for unemployment insurance benefits, is dependent on the existence of an employment relationship between Mr. Park and CRE. The Act defines "employment" in sections 206 and 207 as any service performed by an individual for an employing unit, and includes an individual's entire service, both within and without Illinois, if the service is not localized in any one state but some of the service is performed in Illinois and the base of operations is in Illinois. 820 ILCS 405/206, 207 (West 2010). CRE does not dispute that it was an employing unit, nor does it argue that the Director erred in finding that Mr. Park performed services for it in Illinois and that the base of operations was in Illinois such that Mr. Park's relationship with CRE would ordinarily fall within the section 206 and section 207 definition of "employment"; rather, CRE contends on appeal that no such employment relationship existed because Mr. Park fell within (1) the independent contractor exemption to sections 206 and 207 set forth under section 212 of the Act; and (2) the truck owner-operator exemption set forth in section 212.1. First we analyze whether the independent contractor exemption applies. Then we analyze whether the truck owner-operator exemption applies.

¶ 48               A. The Section 212 Independent Contractor Exemption

¶ 49     As we discussed earlier in this opinion, section 212 of the Act sets forth three requirements for the independent contractor exemption to apply here: (1) that Mr. Park was free from CRE's

control or direction over the performance of his services; (2) the services he provided were outside the usual course of CRE's business or were performed outside all of CRE's places of business; and (3) Mr. Park was engaged in an independently established trade, occupation, profession or business. 820 ILCS 405/212 (West 2010).

¶ 50    CRE bears the burden of proving that the section 212 exemption applies. *Jack Bradley, Inc. v. Department of Employment Security*, 146 Ill. 2d 61, 75 (1991). "Because the three conditions of section 212 are phrased in the conjunctive, all three conditions must be satisfied for the independent-contractor exemption to apply." *AFM*, 198 Ill. 2d at 397. "The terms of the three statutory elements dictate whether the exemption operates, and the designation or description that the parties apply to their relationship is not controlling." *Cohen Furniture Co. v. Department of Employment Security*, 307 Ill. App. 3d 978, 982 (1999) (citing 56 Ill. Adm. Code 2732.200(b)). "Therefore, even though the standard-form contract utilized by the parties in this case purports to be an independent contractor agreement, that designation does not control." *Cohen Furniture Co.*, 307 Ill. App. 3d at 982. "In addition, because the Act was passed with the public welfare in mind, its provisions should be liberally construed in favor of inclusion." *AFM*, 198 Ill. 2d at 398.

¶ 51    The determination of whether Mr. Park was an independent contractor under section 212 of the Act is a mixed question of law and fact subject to review under the clearly erroneous standard. *SMRJ, Inc. v. Russell*, 378 Ill. App. 3d 563, 571-72 (2007). The Director's decision will be deemed clearly erroneous only where "the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM*, 198 Ill. 2d at 395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 52    In this case, the Director found that CRE had failed to meet its burden as to all three conditions of section 212. Because the inability to satisfy any one condition will defeat CRE's claim for an independent-contractor exemption, it is not necessary for us to consider whether all three conditions have been satisfied. *AFM*, 198 Ill. 2d at 398; *SMRJ, Inc.*, 378 Ill. App. 3d at 573-74. Instead, we focus on the second condition (section 212(B)), which requires CRE to prove that Mr. Park's services were either outside CRE's usual course of business or performed outside all of CRE's places of business. 820 ILCS 405/212 (West 2010). As the two factors set forth in section 212(B) are in the alternative, CRE need only demonstrate the existence of one to satisfy section 212(B).

¶ 53    First we address whether CRE proved the first factor in section 212(B), that Mr. Park's services were outside CRE's usual course of business. Then we address whether CRE proved the second factor in section 212(B), that Mr. Park's services were performed outside all of CRE's places of business.

¶ 54    To determine whether CRE proved the first factor in section 212(B), that Mr. Park's services fell outside CRE's usual course of business, "the key to this inquiry is whether the services are necessary to the business of the employing unit or merely incidental." *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 386 (2002). For example, "when one is in the business of selling a product, sales calls made by sales representatives are in the usual course of business because sales calls are necessary. [Citation.] When one is in the business of dispatching limousines, the services of chauffeurs are provided in the usual course of business because the act of driving is necessary to the business. [Citation.]" *Id.*

¶ 55    In the present case, the Director determined that Mr. Park's services in leasing a truck from Horizon and then leasing it back to CRE pursuant to federal leasing regulations, and in hauling freight in said truck for CRE's dedicated account pursuant to instructions from CRE driver-managers, were necessary to the business of CRE as a freight-hauling trucking company and motor carrier and, thus, were in the usual course of business. We cannot say the Director's decision was clearly erroneous such that we are left with the definite and firm conviction that a mistake has been committed, given that CRE's freight-hauling and motor carrier business would not exist without drivers such as Mr. Park to lease and drive the trucks and haul the freight. Accordingly, we find that CRE failed to prove the first factor in section 212(B)'s exemption for independent contractors, that Mr. Park's services were outside its usual course of business.

¶ 56    Next, we address whether CRE proved the second factor in section 212(B)'s exemption for independent contractors, that Mr. Park's services were provided outside of all CRE's places of business. *Chicago Messenger Service v. Jordan*, 356 Ill. App. 3d 101 (2005), is instructive. Chicago Messenger Service (CMS) was a messenger delivery service that utilized couriers to pick up, transport, and deliver packages. *Id.* at 103. In 1992, the Department determined that CMS was engaged in an employment relationship with the couriers for the years 1989 and 1990 and issued an assessment against CMS for unpaid unemployment insurance contributions plus interest for those years. *Id.* CMS filed a protest, arguing that the couriers were independent contractors under section 212(B) instead of employees and, thus, that CMS owed no unemployment insurance contributions. *Id.* at 102-03. A hearing was held before the Director's representative. *Id.* at 103.

¶ 57    At the hearing, the testimony showed that after customers placed orders for package deliveries, the orders were dispatched to the couriers, who made the pickups and deliveries by car or bicycle. *Id.* The couriers were not required to accept any particular assignments for deliveries, nor were they required to work certain hours or fulfill a certain quota of deliveries. *Id.* The couriers were paid after they provided CMS with a weekly invoice of their deliveries. *Id.*

¶ 58    The Director ultimately found, in pertinent part, that CMS had not proved that the couriers were independent contractors under section 212(B). *Id.* at 104. Instead, the Director found that the couriers were employees for whom CMS owed more than $125,000 plus interest for unpaid unemployment insurance contributions for 1989 and 1990. *Id.* at 102. On administrative review, the circuit court affirmed the Director. *Id.* at 104. CMS appealed. *Id.*

¶ 59    The issue on appeal was whether CMS had proved the second factor of the section 212(B) exemption for independent contractors, specifically, that the couriers had performed their service outside of all of CMS's places of business. *Id.* at 107. After extensive analysis of case law, the appellate court (sometimes referred to as the *CMS* court) held that for purposes of section 212(B), an employer's place of business extends to any location where workers regularly represent the employer's interests. *Id.* at 115-16. The *CMS* court also noted:

    "The nature of the package delivery business here *** requires the couriers to perform their services at various locations. Because the delivery of packages, like the transport of passengers, requires travel from one place to another, the services involved in this function must be performed at various locations. Therefore, we think it logical to conclude that *** the couriers represent CMS' interests when they provide their services at these various locations. ***

- 11 -

*** [I]t stands to reason that [CMS's] interests are represented during the performance of that [courier] service and that the place of business includes travel between one location and another. Therefore, the couriers perform their services on the roadways, which are, then, for purposes of section 212(B), the place of business." *Id*.

¶ 60     In other words, the *CMS* court held that the couriers represented CMS's interests and, thus, performed their services in CMS's place of business, whenever they traveled the roadways picking up and delivering their packages. Accordingly, as CMS failed to satisfy its burden under section 212(B) of showing that the couriers performed their service *outside* of all of CMS's places of business, the independent contractor exemption did not apply. *Id*. at 116.

¶ 61     In the present case, the nature of CRE's freight-hauling business required Mr. Park to pick up freight at the Walmart distribution center in Sterling, Illinois, transport the freight over the roadways, and delivery it to various Walmart distribution centers and Walmart retail stores in Illinois or another state. As in *CMS*, we think it logical to conclude that Mr. Park represented CRE's interests when picking up the freight at the Walmart distribution center in Sterling, Illinois, when transporting the freight along the roadways, and when delivering the freight to the other Walmart distribution centers and/or Walmart retail stores. Accordingly, CRE's place of business extended to all the locations where Mr. Park provided these freight-hauling services; thus, CRE failed to meet the second condition for finding that Mr. Park was an independent contractor under section 212(B), specifically, CRE failed to prove that Mr. Park's services were performed outside all of CRE's places of business.

¶ 62     Because CRE failed to satisfy its burden under section 212(B), the Director's finding that Mr. Park was an employee of CRE, and not an independent contractor, was not clearly erroneous.

¶ 63     CRE next argues that certain federal transportation law (49 U.S.C. § 14102 and attendant federal regulations) preempts section 212(B) and therefore the Director erred in considering section 212(B) when determining whether CRE satisfied its burden of proving that Mr. Park was an independent contractor. The supremacy clause of the United States Constitution states: "This Constitution, and the Laws of the United States *** shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. "The supremacy clause has been interpreted by the United States Supreme Court to mean that Congress has the power to preempt state law [citation] provided, of course, that it is acting within the powers granted to it by the Constitution when it does so [citation]. However, because of the extraordinary nature of this power and its implications for the critical political balance between the state and federal governments, the United States Supreme Court has cautioned that it is a power we must assume Congress does not exercise lightly." *Performance Marketing Ass'n v. Hamer*, 2013 IL 114496, ¶ 49.

¶ 64     "Consistent with this admonition, the Supreme Court has held that preemption analysis must begin with the presumption that Congress did not intend to supplant state law. [Citations.] Where a state statute is claimed to be preempted by an act of Congress *** the language used in the federal legislation is the best evidence of whether or not Congress intended it to have preemptive effect." *Id*. ¶ 50.

¶ 65     The supremacy clause preempts state law in three circumstances: (1) when the express language of a federal statute indicates an intent to preempt state law; (2) when the scope of a federal regulation is so pervasive that it implies an intent to occupy a field exclusively; and (3) when state law actually conflicts with federal law. *Coram v. State of Illinois*, 2013 IL 113867, ¶ 71. The key inquiry in preemption cases is the objective of Congress in enacting the particular statute. *Id*. Federal preemption presents a question of law subject to *de novo* review. *People v. Williams*, 235 Ill. 2d 178, 186 (2009).

¶ 66     In the present case, CRE contends 49 U.S.C. § 14102 and attendant federal regulations, which give the Secretary of the federal Department of Transportation regulatory authority over the leasing of motor vehicles used in interstate commerce, preempt section 212(B) of the Act. We disagree. With respect to the first circumstance of preemption (express preemption), there is no language in 49 U.S.C. § 14102 and the attendant federal regulations expressly preempting section 212(B) of the Act. With respect to the second circumstance of preemption, whether Congress implied an intent in 49 U.S.C. § 14102 and the attendant federal regulations to preempt section 212(B) of the Act, *Western Ports Transportation, Inc. v. Employment Security Department*, 41 P.3d 510 (Wash. Ct. App. 2002), is instructive. *Western Ports* similarly addressed whether 49 U.S.C. § 14102 and attendant federal regulations preempt state employment security law. The *Western Ports* court stated:

> "[F]ederal regulations permit motor carriers operating in interstate commerce to utilize owners/drivers to serve the carriers' customers under lease arrangements ***. Such lease arrangements are heavily regulated to insure that lessee/common carriers remain completely responsible for the possession, control, use, and operation of the leased equipment during the term of the lease. 49 CFR § 376.12(c)(1) ('The lease shall provide that the authorized carrier lessee shall have exclusive possession, control and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.') But 49 CFR § 376.12(c)(4) specifically provides that nothing in subsection (c)(1) is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the lessee/common carrier. Rather, '[a]n independent contractor relationship *may* exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.' 49 CFR § 376.12(c)(4) (Emphasis added).

> Thus, motor carriers operating in interstate commerce are permitted to provide transportation services to their customers utilizing leased vehicles-with-drivers, and such drivers (including owner drivers) may be independent contractors or they may be employees, but even if they are independent contractors, the carriers cannot escape ultimate responsibility for safety of operations and equipment. The same regulations apply to leased trucks-with-drivers whether or not the drivers are considered employees of the motor carrier or independent contractors.

> Title 49 of the Code of Federal Regulations, at Part 376, contains detailed regulations governing such lease arrangements. ***

> On their face, these regulations are designed to fix responsibility for the safe operation of leased vehicles-with-drivers in interstate commerce on the carrier, and to provide a paper trail by which such responsibility can be audited; they are not designed to protect motor carriers from responsibility under state laws governing unemployment

benefits. \*\*\* [W]hen Congress has intended to prohibit state taxing authorities from 'burdening' interstate commerce, it has done so, expressly, clearly and understandably. Nowhere in the federal motor carrier statutes and regulations \*\*\* has Congress even mentioned state unemployment law.

'The purpose of Congress is the ultimate touchstone' in every preemption case. [Citation.] We address preemption claims with the presumption that Congress did not intend to supplant state law. [Citation.] We decline to infer that Congress, in enacting federal motor carrier law, intended to preempt state unemployment law. These two types of statutes and regulations have very different policy objectives. Federal transportation law promotes public safety and provides for the easy flow of goods in interstate commerce. State unemployment law provides temporary assistance to workers during periods of involuntary unemployment." *Western Ports*, 41 P.3d at 518-19.

¶ 67 We agree with the reasoning utilized in *Western Ports* and similarly decline to infer that in enacting 49 U.S.C. § 14102 and attendant federal regulations, Congress impliedly intended to preempt state unemployment insurance law (such as section 212(B) of the Act), where the two types of statutes and regulations have different policy objectives.

¶ 68 CRE argues, though, that even if the first two circumstances of federal preemption (express and implied preemption) do not apply here, the third circumstance (preemption when state law conflicts with federal law) does apply. Specifically, CRE argues that section 212(B) of the Act defines "independent contractor" in such a way as to absolutely eliminate a truck driver in Illinois from being considered an independent contractor and, as such, conflicts with 49 U.S.C. § 14102 and the attendant federal regulations, which specifically provide that the level of control that must be exerted by a common carrier over its drivers does *not* prevent those drivers from being considered independent contractors.

¶ 69 We disagree with CRE's preemption argument. Addressing a similar issue regarding whether the Colorado employment security act conflicted with other laws, the Colorado Court of Appeals held that "it is legally permissible for an individual to be an employee for unemployment tax liability purposes at the same time the individual is considered to be an independent contractor for other purposes under other laws." *SZL, Inc. v. Industrial Claim Appeals Office*, 254 P.3d 1180, 1186 (Colo. App. 2011). See also *Western Ports*, 41 P.3d at 520 (holding that the "only employment defined by the [unemployment insurance] act is the employment intended to be covered by the act for the purpose of the act and none other").

¶ 70 Similarly, in the present case, section 212(B)'s definition of independent contractor is for purposes of the Act only and none other; thus, in upholding the Director's determination that Mr. Park was in covered employment with CRE under sections 206 and 207 of the Act and not an independent contractor under section 212(B) of the Act, the effect is only to determine that Mr. Park was entitled to unemployment insurance benefits and that CRE was the chargeable last employer. That is *not* to say that motor carriers and drivers may not establish independent contractor relationships outside the context of the Act. Accordingly, section 212(B)'s definition of independent contractor for unemployment insurance purposes does not conflict with 49 U.S.C. § 14102 and the attendant federal regulations regarding transportation law. In the absence of a conflict, the third circumstance of preemption does not apply here.

¶ 71 CRE next argues that even if section 212(B) of the Act is not preempted by 49 U.S.C. § 14102 and its attendant federal regulations, section 212(B) *is* preempted by the Federal

Aviation Administration Authorization Act of 1994 (the FAA Authorization Act) (49 U.S.C. § 14501(c)(1) (2012)) applicable to motor carriers. Section 14501(c)(1) (49 U.S.C. § 14501(c)(1) (2012)) states:

> "[A] State *** may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier *** with respect to the transportation of property."

¶ 72     In construing the FAA Authorization Act, the United States Supreme Court has recently held:

> "Although § 14501(c)(1) otherwise tracks the [Airline Deregulation Act of 1978's] air-carrier preemption provision, [citation], [the FAA Authorization Act] formulation contains one conspicuous alteration–the addition of the words 'with respect to the transportation of property.' That phrase 'massively limits the scope of preemption' ordered by the [the FAA Authorization Act]. [Citation.] *** [F]or purposes of [the FAA Authorization Act] preemption, it is not sufficient that a state law relates to the 'price, route, or service' of a motor carrier in any capacity; the law must also concern a motor carrier's 'transportation of property.' [Citation.]" *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. ___, ___, 133 S. Ct. 1769, 1778-79 (2013).

¶ 73     In the present case, CRE argues that the effect of section 212(B) of the Act is to preclude CRE from utilizing independent contractor drivers in Illinois, thereby impacting its services with respect to the transportation of property. Accordingly, CRE contends section 212(B) falls within the scope of the FAA Authorization Act's preemption.

¶ 74     We disagree. As discussed earlier in this opinion, section 212(B) defines independent contractor for purposes of the Act only and does not prohibit motor carriers and drivers from establishing independent contractor relationships outside the context of the Act. Since section 212(B)'s definition of independent contractor is limited to determining whether an individual is entitled to unemployment insurance benefits under the Act and does not otherwise prohibit or preclude motor carriers from utilizing independent contractor drivers in Illinois, CRE has failed to show that section 212(B) relates to the "service of [a] motor carrier *** with respect to the transportation of property" (49 U.S.C. § 14501(c)(1) (2012)), so as to fall within the massively limited scope of preemption ordered by the FAA Authorization Act.

¶ 75                              B. The Section 212.1 Truck Owner-Operator Exemption

¶ 76     Next, we address CRE's argument that Mr. Park's services for CRE fell within the exemption for employment set forth in section 212.1 of the Act (the truck owner-operator exemption) and, thus, that the Director erred in finding that CRE was the chargeable last employer for Mr. Park's claim for unemployment insurance benefits. Section 212.1 sets forth various conditions in the conjunctive that CRE must prove in order for the exemption to apply. Because the inability to satisfy any one condition will defeat CRE's claim for a truck owner-operator exemption (*Davis Bancorp, Inc. v. Board of Review of the Department of Employment Security*, 393 Ill. App. 3d 135, 142 (2009)), it is not necessary for us to set forth and consider whether all the conditions have been satisfied. Instead, we focus on the sixth condition, which states in pertinent part:

"The term 'employment' shall not include services performed by an individual as an operator of a truck, truck-tractor, or tractor, provided the person or entity to which the individual is contracted for service shows that the individual:

\* \* \*

(6) Maintains a separate business identity, offering or advertising his or her services to the public, by displaying its name and address on the equipment or otherwise." 820 ILCS 405/212.1 (West 2010).

¶ 77    CRE presented no evidence that Mr. Park offered or advertised his services to the public by displaying the name and address of his separate business identity on his leased truck. Nor does CRE point to any evidence that Mr. Park "otherwise" offered or advertised his services to the public. Accordingly, the Director's finding that Mr. Park did not fall within the section 212.1 truck owner-operator exemption was not clearly erroneous.

¶ 78            VI. The Board of Review's Finding That Mr. Park Was Discharged for Other Than
                        Employment-Related Misconduct

¶ 79    Next, we address defendants' appeal from the circuit court's order reversing the Board of Review's decision that CRE discharged Mr. Park for reasons other than employment-related misconduct and, thus, that Mr. Park was eligible for unemployment insurance benefits under section 602(A) of the Act. We review the Board of Review's decision, not the decision of the circuit court. *Abbott Industries, Inc.*, 2011 IL App (2d) 100610, ¶ 15. Whether an employee committed misconduct under the Act is a mixed question of law and fact subject to the clearly erroneous standard of review. *Id.* ¶ 16.

¶ 80    Individuals who are discharged for misconduct are ineligible to receive unemployment benefits under section 602(A) of the Act. 820 ILCS 405/602(A) (West 2010). "[T]hree elements must be proven to establish disqualifying misconduct under [section 602(A) of] the Act: (1) that there was a 'deliberate and willful' violation of a rule or policy; (2) that the rule or policy of the employing unit was reasonable; and (3) that the violation either has harmed the employer or was repeated by the employee despite previous warnings." *Messer & Stilp, Ltd. v. Department of Employment Security*, 392 Ill. App. 3d 849, 856 (2009). "In construing the requirement that an employee's violations of the employer's rules must be 'deliberate and willful,' courts have repeatedly held that this language reflects the General Assembly's intent that only those who intentionally act contrary to their employers' rules should be disqualified on the basis of misconduct, while those who have been discharged because of their inadvertent or negligent acts, or their incapacity or inability to perform their assigned tasks, should receive benefits." *Abbott Industries, Inc.*, 2011 IL App (2d) 100610, ¶ 19.

¶ 81    The Board of Review found that Mr. Park was not discharged for employment-related misconduct, stating:

        "The claimant [Mr. Park] was employed as a driver. He started working for the employer [CRE] on 11/16/2009. The claimant last performed work and earned wages on 5/14/2010. The claimant was discharged on the premise that he was involved in an accident. On 5/13/2010, the claimant hit a power pole when he made a turn into a parking lot. The damages resulting from the accident were $31,000.00. The claimant did receive a citation. The claimant testified that although he drove to the best of his ability, that he took the turn too sharp, not leaving enough room for the trailer to clear

- 16 -

the telephone pole. The claimant immediately notified the police and the employer. The claimant did not have any previous accidents. There was no evidence presented that the claimant did anything deliberate to cause the accident. *** In this case, the claimant drove to the best of his ability, but was discharged for being involved in an accident. The preponderance of the evidence showed that the claimant did not meet the employer's expectations due to negligence, which is not misconduct under the Act. *** In this case the employer failed to show that the claimant's accident was the result of any deliberate conduct or willful refusal to follow instructions. Therefore, the claimant was discharged for reasons other than misconduct connected with work and is not subject to any disqualification."

¶ 82    The Board of Review's finding that Mr. Park was discharged for reasons other than employment-related misconduct and, thus, was eligible for unemployment insurance benefits under section 602(A) of the Act, was supported by the evidence and was not clearly erroneous. Also, CRE apparently concedes the issue, and has waived review thereof, by failing to respond to defendants' arguments in their appellant's brief that the Board of Review's finding was not clearly erroneous. Ill. S. Ct. R. 341(i) (eff. Feb. 6, 2013).

¶ 83    For all the foregoing reasons, the Director's decision in case number 11 CH 16972, and the Board of Review's decision in case number 11 CH 14681, were supported by the evidence and should not have been disturbed on judicial review. We reverse the circuit court in case number 11 CH 16972 and case number 14681 and affirm the Director and the Board of Review. As a result of our disposition of this case, we need not address the other arguments on appeal.

¶ 84    Circuit court reversed; Director and the Board of Review affirmed.